OREGON RAILWAY AND NAVIGATION COMPANY
*v.* OREGONIAN RAILWAY COMPANY, LIMITED.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF OREGON.

No. 26.   Argued April 27, 30, May 1, 1888.—Decided March 5, 1889.

In the United States a corporation can only have an existence under the
express law of the State by which it is created, and can exercise no
power or authority which is not granted to it by the charter under which
it exists, or by some other legislative act.

When a statute makes a grant of property, powers, or franchises to a private
corporation or to a private individual, the construction of the grant in
doubtful points should always be against the grantee, and in favor of the
government; and this general rule of construction applies with still
greater force to articles of association organizing a corporation under
general laws.

The power to lease a railroad, its appurtenances and franchises is not to be
presumed from the usual grant of powers in a railroad charter; and,
unless authorized by legislative action so to do, one company cannot
transfer them to another company by lease, nor can the other company
receive and operate them under such a lease.

The constitution and general laws of Oregon do not authorize a railroad
corporation, organized under the laws of the State, to take a lease of a
railroad and franchises.

The general laws of Oregon confer upon a foreign corporation no right to
make a lease of a railroad within the State, but only the right to con-
struct or acquire and operate one there.

VOL. CXXX—1

When a state constitution contains a general provision that corporations shall not be created by special laws, but may be formed under general laws, no private corporation can be created thereafter until such general law has been enacted.

When a corporation is organized through articles of association entered into under general laws, the memorandum of association stands in the place of a legislative charter in so far that its powers cannot exceed those enumerated therein; but powers enumerated and claimed therein which are not warranted by statute are void for want of authority. *Thomas* v. *Railroad Co.*, 101 U. S. 71, explained.

The use of the words "successors or assigns" in a proviso attached to a statute making specific grants to a corporation does not necessarily imply that the corporation can transfer all its property and its franchises to another corporation, to be exercised by the latter.

A provision in a general act for organizing corporations for the purpose of navigating streams, with power to construct railroads where portage is necessary, that a corporation organized under it shall not lease such a railroad, does not imply that without such a restraint the corporation could make such a lease.

A provision in a general act for the organization of corporations that a corporation organized under it may authorize its own dissolution and the disposition of its property thereafter, does not authorize such a corporation, not dissolving but continuing in existence, to dispose of all its corporate franchises and powers by lease.

The operation of a railroad and payment of rent for three years by a lessee under a lease of it for ninety-six years, which was executed in violation of the corporate powers both of the lessor and of the lessee, does not so far execute the contract of lease by part performance, as to estop the lessee from setting up its illegality in an action at law to recover after accruing rent.

THE case, as stated by the court in its opinion, was as follows:

This is a writ of error to the Circuit Court of the United States for the District of Oregon.

The Oregonian Railway Company, Limited, recovered a judgment against the Oregon Railway and Navigation Company for the sum of $68,131, on a contract for the lease of a railroad owned by the plaintiff in the suit, which had been leased to and used by the defendant. This sum was for the semi-annual payment of rent, in advance, for the half year beginning May 15, 1884.

The Oregonian Railway Company, Limited, was organized in Scotland, under what are called "The Companies' Acts," of

Parliament of 1862, 1867 and 1877, and in the memorandum of association it is declared that its principal office and place of business is at Dundee. The defendant in the action, the Oregon Railway and Navigation Company, was organized under articles of incorporation, filed June 13, 1879, according to the statutes of Oregon on that subject, and its principal office is declared in those articles to be at Portland, Oregon.

After many amendments to the original petition, and still more numerous amended answers, the case came to a hearing before the court on a demurrer to the answer and a motion to strike it out. This motion was denied, but the demurrer was sustained, and as the pleadings were supposed to present all the issues that could arise in the case a judgment was rendered for the plaintiff, to review which this writ of error is prosecuted. 22 Fed. Rep. 245, and 23 Fed. Rep. 232.

The amended petition of the plaintiff sets out the acts of Parliament under which it was organized as a corporation, or so much thereof as is necessary to an understanding of the questions presented by this record, and gives in full its " Memorandum of Association," and also what are called its " Articles of Association." This memorandum, after stating the name of the company as above given, and that its registered office will be situated in Scotland, proceeds to give the objects for which it is established, as follows :

" First. The building, constructing, reconstructing, equipping, owning, operating, leasing or selling, transferring, or disposing of, or purchasing or otherwise acquiring, holding and operating, or otherwise using, working, or dealing in all or any such railway or railways, railroad or railroads, in the State of Oregon and the Territory of Washington, in the United States of America, or in either of them, or between such points in said State or Territory or elsewhere in North America as may from time to time be resolved or determined upon by said company, and the carrying of passengers, goods and minerals and all other traffic and freight on, and the doing and performing of all other acts, deeds and other operations connected with railways and railroads in the said State and Territory, or either of them, or elsewhere in North America.

" Second. The building, constructing, equipping, owning and operating, or the leasing, selling, transferring, holding, or acquiring, by purchase or otherwise, and the working and using of one or more lines or portions of lines of railroad or railway, or parts thereof from (first) the city of Portland or the city of Astoria, in the State of Oregon, United States of America, or from either or both of said cities, or from some other point or place on the Willamette or Columbia rivers, in said State of Oregon, through any part or portion of the said State of Oregon lying west or south of the Cascade range of mountains, in said State, to some point at or near, in or upon said Cascade range of mountains; (second) from thence, or from any part or portion of the western or southwestern part of said State of Oregon, to and across and to the east side of said Cascade range of mountains, through a pass in said mountains at or near that fork or branch of the Willamette River, in said State of Oregon, known as the middle fork or branch of said river, or through some other pass in said mountains, within one hundred miles north or south of said middle fork or branch of said river, where shall be found to be on actual survey the easiest and most practicable route across the Cascade range of mountains; (third) thence through that portion of said State of Oregon lying east of said Cascade range of mountains and on through the Territories of Washington or Idaho, or the States of Nevada and California, in the United States of America, or through all or any one or more of said States and Territories to a connection with, or without making any connection with, any other railway or railways in either of said States of Oregon, California, or Nevada, or Territories of Washington or Idaho, and with or without one or more branch lines (*a*) running north, south, east, or west from said main line on the east side of said Cascade range of mountains, or (*b*) running from said main line on the west side of said Cascade range, in said State of Oregon, forming a junction, or one or more junctions, with said main line, at one or more points, to a terminus in said portion of the State of Oregon west of said Cascade range of mountains, or to a junction with said main line, or to a terminus or termini at one or more sea-

ports on the shores of the Pacific Ocean, all as may from time to time be determined by actual surveys; as also to purchase, build, construct, own, equip and operate, or to enter into agreements to run over or to lease (1) any line or lines, branch or branches, of railway or railways, railroad or railroads, that may connect with or become attached to, or meet or become a part of the said main line or its main branch or any of its branches hereinbefore designated; or (2) such other main or branch line or lines, or extensions of any railway or railways, railroad or railroads, made in connection with this company's main line, or of any of its branches, or separate and distinct therefrom, all in such manner of way or form and on such terms as said company shall from time to time deem advisable and for its interests, and the doing and performing of all other operations connected with said designated railway or railways, railroad or railroads, or branches thereof, or in connection with other railways of a similar or different nature, the doing and performing of which this said company shall at any time deem advisable and for its interests in the carrying out of its business.

"Third. The building, constructing, purchasing, or otherwise acquiring, holding, equipping, owning and operating, or the leasing and operating, or the leasing, equipping and operating, or the selling, transferring, or otherwise disposing of, and the working and using of any other railway or railroad, or of any wharves, jetties, steamboat, or steamship, stage, or of any canals, locks, bridge, clay road, plank road, turnpike, hack, truck, or express lines, or any other line, lines, or means for the transportation of freight or passengers, or either or both, now constructed or operated in whole or in part, or which may be hereafter constructed or operated in whole or in part, in either of the said States of Oregon, California, or Nevada, or said Territories of Washington or Idaho, and that whether in connection with or separate and distinct from, and as line or means independent of said railway or railways, railroad or railroads, so to be built, constructed, purchased, owned, equipped, or operated as aforesaid by this company."

The petition also avers that the company has complied with the statute of Oregon, which authorizes corporations of foreign

countries to do business in that State upon complying with certain requirements. On this averment no issue is raised.

It also alleges that on August 1, 1881, the plaintiff, by an indenture of lease, demised to the defendant a certain railway or railroad owned by the plaintiff, in the State of Oregon, with its stations, depots, and other property connected therewith, for a term of ninety-six years from the date of the lease; and that the defendant, by the terms of said indenture, covenanted and agreed to pay the plaintiff therefor the yearly rental of twenty-eight thousand pounds sterling, in equal half-yearly payments, on the 15th of May and the 11th of November in each year, in advance. It then proceeds to allege "that upon the execution of said indenture of lease the said defendant entered into possession of said demised property, and has continued in the enjoyment of the same to the present time, but that on the fifteenth of May, 1884, the defendant, pretending that neither it nor the plaintiff was authorized or empowered by law to enter into said indenture of lease, tendered and offered to restore possession of said demised property to plaintiff in its then condition," and, disavowing the obligation of the lease, refused to pay any further rent, wherefore the plaintiff prays judgment for the sum of $68,131.

The substance of the numerous answers and amended answers is, that the defendant denies that the plaintiff has any corporate existence; avers that it had no power or authority to make the contract or lease as stated in the petition, and that the contract, although signed by the president of the defendant company, with the seal of that company attached, and the signature of the secretary, by order of its board of directors, is also without legal authority, and is not binding upon the defendant. In fact, the essence of the defence and of the whole controversy is, whether these companies had power under their organization as corporations to make the contract of lease which is the foundation of this action.[1]

---

[1] The following are some of the principal statutes cited and relied on in argument, or referred to in the opinion of the court:

(1) *The British Companies' Act of August* 7, 1862, 25 & 26 *Vict. c.* 89, *under*

The defendant avers that it has fully paid the rent due under the lease for the term ending May 15, 1881, from which

---

*which the Oregonian Railway Company Limited was organized. The following extracts from that act are from the brief of the defendant in error :*

" SEC. VI. Any seven or more persons associated for any lawful purpose may, by subscribing their names to a memorandum of association, and otherwise complying with the requisitions of this act in respect of registration, form an incorporated company, with or without limited liability."

" SEC. VIII. Where a company is formed on the principle of having the liability of its members limited to the amount unpaid on their shares, hereinafter referred to as a company limited by shares, the memorandum of association shall contain the following things (that is to say) : (1) The name of the proposed company, with the addition of the word "limited" as the last word in such name : (2) The part of the United Kingdom, whether *England, Scotland,* or *Ireland,* in which the registered office of the company is proposed to be situate : (3) The objects for which the proposed company is to be established : (4) A declaration that the liability of the members is limited : (5) The amount of capital with which the company proposes to be registered divided into shares of a certain fixed amount : Subject to the following regulations : (1) That no subscriber shall take less than one share : (2) That each subscriber of the memorandum of association shall write opposite to his name the number of shares he takes.

" SEC. IX. Where a company is formed on the principle of having the liability of its members limited to such amount as the members respectively undertake to contribute to the assets of the company in the event of the same being wound up, hereinafter referred to as a company limited by guarantee, the memorandum of association shall contain the following things : (that is to say), (1) The name of the proposed company, with the addition of the word "limited" as the last word in such name : (2) The part of the United Kingdom, whether *England, Scotland,* or *Ireland,* in which the registered office of the company is proposed to be situate : (3) The objects for which the proposed company is to be established : (4) A declaration that each member undertakes to contribute to the assets of the company in the event of the same being wound up, during the time that he is a member, or within one year afterwards, for payment of the debts and liabilities of the company contracted before the time at which he ceases to be a member, and of the costs, charges and expenses of winding up the company, and for the adjustment of the rights of the contributories amongst themselves, such amount as may be required, not exceeding a specified amount."

" SEC. XI. The memorandum of association shall bear the same stamp as if it were a deed, and shall be signed by each subscriber in the presence of, and be attested by, one witness at the least, and that attestation shall be a sufficient attestation in *Scotland,* as well as in *England* and *Ireland :* It

time it disavowed the obligatory force of the contract, and offered to return and deliver up to the plaintiff all the property it held under the lease.

---

shall, when registered, bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in the memorandum contained, on the part of himself, his heirs, executors, and administrators, a covenant to observe all the conditions of such memorandum, subject to the provisions of this act."

" SEC. XIV. The memorandum of association may, in the case of a company limited by shares, and shall, in the case of a company limited by guarantee or unlimited, be accompanied, when registered, by articles of association signed by the subscribers to the memorandum of association, and prescribing such regulations for the company as the subscribers to the memorandum of association deem expedient: The articles shall be expressed in separate paragraphs, numbered arithmetically: They may adopt all or any of the provisions contained in the table marked A in the first schedule hereto: They shall, in case of a company, whether limited by guarantee or unlimited, that has a capital divided into shares, state the amount of capital with which the company proposes to be registered; and in the case of a company, whether limited by guarantee or unlimited, that has not a capital divided into shares, state the number of members with which the company proposes to be registered, for the purpose of enabling the registrar to determine the fees payable on registration: In a company limited by guarantee or unlimited, and having a capital divided into shares, each subscriber shall take one share at the least, and shall write opposite to his name in the memorandum of association the number of shares he takes."

" SEC. XVI. The articles of association shall be printed, they shall bear the same stamp as if they were contained in a deed, and shall be signed by each subscriber in the presence of, and be attested by, one witness at the least, and such attestation shall be a sufficient attestation in *Scotland* as well as *England* and *Ireland:* When registered, they shall bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors and administrators, to conform to all the regulations contained in such articles, subject to the provisions of this act; and all moneys payable by any member to the company, in pursuance of the conditions and regulations of the company, or any of such conditions or regulations, shall be deemed to be a debt due from such member to the company, and in *England* and *Ireland* to be in the nature of a specialty debt.

" SEC. XVII. The memorandum of association and the articles of association, if any, shall be delivered to the registrar of joint stock companies hereinafter mentioned, who shall retain and register the same: There shall be paid to the registrar by a company having a capital divided into shares,

It appears also by the pleadings, both on the part of the plaintiff and defendant, that they entered into an agreement,

in respect of the several matters mentioned in the table marked B in the first schedule hereto, the several fees therein specified, or such smaller fees as the Board of Trade may from time to time direct; and by a company not having a capital divided into shares in respect of the several matters mentioned in the table marked C in the first schedule hereto, the several fees therein specified, or such smaller fees as the Board of Trade may from time to time direct: All fees paid to the said registrar in pursuance of this act shall be paid into the receipt of Her Majesty's Exchequer, and be carried to the account of the consolidated fund of the United Kingdom of Great Britain and Ireland.

" SEC. XVIII. Upon the registration of the memorandum of association and of the articles of association in cases where articles of association are required by this act or by the desire of the parties to be registered, the registrar shall certify under his hand that the company is incorporated, and in the case of a limited company that the company is limited: the subscribers of the memorandum of association, together with such other persons as may from time to time become members of the company, shall thereupon be a body corporate by the name contained in the memorandum of association, capable forthwith of exercising all the functions of an incorporated company, and having perpetual succession and a common seal, with power to hold lands, but with such liability on the part of the members to contribute to the assets of the company in the event of the same being wound up as is hereinafter mentioned: A certificate of the incorporation of any company given by the registrar shall be conclusive evidence that all the requisitions of this act in respect of registration have been complied with."

(2) *The provisions in the constitution and laws of Oregon relating to the organization of corporations, of which the following are the most material :*

(a) *Constitution of Oregon, Article XI, Section 2.*

" Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes. All laws passed pursuant to this section may be altered, amended, or repealed, but not so as to impair or destroy any vested corporate rights."

(b) *The Oregon Corporation Act of October 14, 1862, as amended October 20, 1864, and October 24, 1866.*

" SEC. 1. Whenever three or more persons shall desire to incorporate themselves, for the purpose of engaging in any lawful enterprise, business, pursuit, or occupation, they may do so in the manner provided in this act.

" SEC. 2. Such persons shall make and subscribe written articles of incorporation in triplicate, and acknowledge the same before any officer

by which the defendant company was to continue to use the
road for the time being, in order to prevent serious loss arising

---

authorized to take the acknowledgment of a deed; and file one of such
articles in the office of the Secretary of State, another with the clerk of the
county where the enterprise, business, pursuit, or occupation is proposed
to be carried on, or the principal office or place of business is proposed to
be located, and retain the third in the possession of the corporation.

"SEC. 3. The articles of incorporation, or a certified copy of the one
filed with the Secretary of State or the County Clerk, is evidence of the
existence of such corporation.

"SEC. 4. The articles of incorporation shall specify: 1. The name
assumed by the corporation, and by which it shall be known, and the dura-
tion of the corporation if limited; 2. The enterprise, business, pursuit, or
occupation in which the corporation proposes to engage; 3. The place
where the corporation proposes to have its principal office or place of busi-
ness; 4. The amount of the capital stock of the corporation; 5. The
amount of each share of such capital stock; 6. If the corporation is formed
for the purpose of navigating any stream or other water, or making or
constructing any railroad, macadamized road, plank road, clay road, canal
or bridge, the termini of such navigation, road, canal, or the site of such
bridge.

"SEC. 5. Upon the making and filing of the articles of incorporation as
herein provided, the persons subscribing the same are corporators, and
authorized to carry into effect the objects specified in the articles, in the
manner provided in this act; and they and their successors, associates and
assigns, by the name assumed in such articles, shall thereafter be deemed
a body corporate with power: 1. To sue and be sued; 2. To contract and
be contracted with; 3. To have and use a corporate seal, and the same to
alter at pleasure; 4. To purchase, possess and dispose of such real and
personal property as may be necessary and convenient to carry into effect
the object of the incorporation; 5. To appoint such subordinate officers
and agents as the business of the corporation may require, and prescribe
their duties and compensation; 6. To make by-laws, not inconsistent with
any existing law, for the sale of any portion of its stock for delinquent or
unpaid assessments due thereon, which sale may be made without judgment
or execution; Provided, That no such sale shall be made without thirty
days' notice of time and place of sale, in some newspaper in circulation in
the neighborhood of such company, for the transfer of its stock, for the
management of its property, and for the general regulation of its affairs."

"SEC. 9. . . . From the first meeting of the directors, the powers
vested in the corporation are exercised by them, or by their officers or
agents, except as otherwise specially provided in this chapter."

"SEC. 11. . . . The powers vested in the directors may be exercised
by a majority of them, and any less number may constitute a quorum at all
regular or stated meetings authorized by the by-laws of the corporation in all

from the disruption of the relations of the two railroads, but that such use was not to be construed as being under the

---

the cases when either the directors or incorporators shall have filed with the Secretary of State and county clerk a written statement designating such less number sufficient to form a quorum. . . ."

" SEC. 19. Any corporation organized under the provisions of this act may, at any meeting of the stockholders which is called for such purpose, by a vote of the majority of the stock of such corporation, increase or diminish its capital stock or the amount of the shares thereof, or authorize the dissolution of such corporation and the settling of its business and disposing of its property and dividing its capital stock; *provided, however,* that the capital stock of any corporation formed under this act, except corporations formed for the purpose of making and constructing a railroad, shall never exceed the sum of two million of dollars, and any corporation that shall violate this provision of this act shall forfeit its corporate rights.

" SEC. 20. Any corporation formed for the purpose of navigating any stream or other water, may, by virtue of such incorporation, construct any railroad, macadamized road, plank road or clay road, or canal or bridge, necessary and convenient for the purpose of transporting freight or passengers across any portages on the line of such navigation, occasioned by any rapids or other obstructions to the navigation of such stream or other water, in like manner and with like effect as if such corporation had been specially formed for such purpose; but no corporation formed under this act or heretofore or hereafter incorporated by any special act of incorporation, passed by the Legislative Assembly of this State or otherwise, for the purpose of navigating any stream or other water of this State, or forming the boundary thereof in whole or in part, nor any stockholder in such corporation, shall ever take or hold stock, or any interest directly or indirectly in the stock of any corporation which may be formed under this act, for the purpose of building or constructing any road in this act mentioned; nor shall any such corporation ever purchase, lease or in any way control such road or the corporate rights of such last-named corporation; *provided further*, that corporations heretofore incorporated or which may hereafter be formed under this act for the purpose of establishing and keeping a ferry across any stream or other water of this State or forming the boundary thereof, in whole or in part, shall not be deemed a corporation for the purpose of navigating such stream or water within the meaning of this act, nor shall the stockholders thereof be restrained from taking or holding stock in a corporation formed under this act for the purpose of constructing or building any road."

(c) *An act passed October* 18, 1878, *to amend section twenty (above quoted) so as to read as follows:*

" Any corporation formed for the purpose of navigating any stream or other water may, by virtue of such incorporation, construct any railway,

lease, nor as binding either party beyond what the law would imply if this arrangement had not been made. There is also

---

macadamized road, plank road, or clay road, or canal, or bridge necessary or convenient for the purpose of transporting freight or passengers across any portage on the line of such navigation, occasioned by any rapids or other obstructions to the navigation of such stream, or other water, in like manner, and with like effect, as if such corporation had been formed for such purpose."

(d) " *An act to authorize foreign incorporations to do business and exercise their corporate powers within the State of Oregon, passed October 21, 1878.*

" SEC. 1. That any foreign incorporation incorporated for the purpose of constructing, or constructing and operating, or for the purpose of or with the power of acquiring and operating any railway, macadamized road, plank road, clay road, canal or bridge, or for the purpose of conducting water, gas or other substance, by means of pipes laid under ground, shall, on compliance with the laws of this State for the regulation of foreign corporations transacting business therein, have the same rights, powers and privileges in the exercise of the rights of eminent domain, collection of tolls, and other prerogative franchises as are given by the laws of this State to corporations organized within this State, for the purpose of constructing any railway, macadamized road, plank road, clay road, canal or bridge, or for the purpose of conducting water by means of pipes laid under the surface of the ground.

" SEC. 2. Nothing in this act contained shall be so construed as to give to any foreign corporation or corporations, any other or further rights, powers, or privileges than may be acquired or exercised by corporations incorporated under the laws of this State; but only so as to give to foreign corporations the same rights, powers and privileges, on a compliance with the laws of this State, as may be acquired or exercised by corporations incorporated under the laws of this State."

(e) " *Act of 22d October, 1880, entitled an act to grant the Oregonian Railway Company, Limited, the right of way and station grounds over the state lands, and terminal facilities upon the public grounds at the city of Portland.*"

\*     \*     \*     \*     \*

" *Whereas*, the Oregonian Railway Company, Limited, is now engaged in the construction of a system of railways in the State of Oregon, from the city of Portland, the most used shipping port of this State, to the head of the Willamette Valley, and to a connection with the systems of railroads having a connection with those States and Territories of the United States situate east of the Rocky Mountains, and the building of the railway of said company will be of great benefit and lasting advantage to the people of this State: . . . Now, therefore,

Statement of the Case.

an averment in the petition that the property was not in the same condition when the offer to return it was made as it was

---

"*Be it enacted, &c.*, That there by [be] and is hereby granted to the Oregonian Railway Company, Limited, a corporation at this time engaged in the construction and operation of a railway in the State of Oregon, and to its assigns, the owners and operators of the railway now being constructed by it, and for the use of said railway, in the construction, use and operation thereof, the rights, privileges, easements, and property following, that is to say:

"SEC. 1. Those certain premises situate in the city of Portland, in the State of Oregon, and commonly known as the public levee, . . . to be held, used and enjoyed for occupation by track, side track, water stations, depot buildings, wharves and warehouses, and such other buildings and erections of such form and manner of construction as may be found requisite, necessary or convenient in the receiving, shipping and storing of produce, goods, wares, merchandise and generally of all kinds of freight, and for use generally and in the manner usual and ordinary for depot purposes, and as such to be under the exclusive management and control of the owners of said railway;

"*Provided, always*, That the said Oregonian Railway Company, Limited, or its assigns, shall have no power to sell, convey or assign the premises or rights hereby granted, or any part or parcel thereof, to any person, persons, firm or corporation, save only with and as part and parcel of, and as appurtenant to the railway now built and owned by said company, and now in process of construction by it. . . ."

(f) *The paper referred to by the Court in its opinion on page 29, entitled,* "*Public Statutes of Oregon recognizing the assignability of railroads.*"

"In addition to the Oregonian Railway Company's Act of 22 Oct., 1880, there are the following:

"1. *The Oregon Railway and Navigation Co.'s Act — Oregon Statutes, 25 Oct. 1880 —*

"Recites that 'the O. R. & N. Co. was duly incorporated on July 13, 1879, for the purpose, among other things, of,' etc. SEC. 1. That there be and there is hereby granted to the said O. R. & N. Co., its *successors and assigns*, the right of way through any and all lands belonging to the State of Oregon, etc. SEC. 2. Whenever said company, *its successors or assigns*, shall file, etc.

"2. *Statutes of Oregon for* 1880, *p. 55 — Astoria and Winnemucca Railroad Co.'s Act.*

"SEC. 1. That there be and is hereby granted to the A. & W. R. R. Co., *and its assigns*, the right of way, etc. . . . SEC. 4. That the same company shall have the right, and *it and its assigns* are hereby authorized to construct bridges, etc.

when it was received; but this is denied in the answer, and as no proof was taken in regard to that fact it can make no figure in the case as presented to this court.

*Mr. J. N. Dolph* and *Mr. James C. Carter* for plaintiff in error.

*Mr. Sidney Bartlett* also filed a brief for plaintiff in error.

*Mr. Attorney General* and *Mr. George F. Edmunds* (with whom was *Mr. Edmund Robertson* on the brief) for defendant in error.

I. The lease was within the corporate powers of the defendant. It is admitted that the contract in question is covered

---

"3. *Oregon Statutes,* 1878, 55 — *Portland Bridge Co.'s Act.*

"Sec. 1. That it shall be lawful for the Portland Bridge Co., a corporation duly incorporated under and in conformity with the law of Oregon, or *its assigns,* and that said corporation or *its assigns* be and are hereby authorized and empowered to construct, build, etc.

"4. *Statutes of* 1882, 7 — *Oregon Short-Line Railway Co.'s Act* — 17 *October.*

"Sec. 1. That there be and hereby is granted the said O. S. L. R. Co., and *its successors or assigns,* the right of way, etc.

"5. *Statutes of* 1872, 16 — *Portland, Dalles and Salt Lake R. R. Co.'s Act* — 15 *Oct.*

"Sec. 1. Grants proceeds of land sales. Sec. 2. Grants rights of way. . . . Sec. 11. The rights and privileges of this company, hereby granted, shall not be assignable to any other company without the assent of the Legislature.

"6. *Statutes of* 1874, 14 — *Oregon Central Pacific Railway and Telegraphic Line* — 24 *Oct.* 1874.

"Sec. 1. That there be and is hereby granted to the Oregon Central Pacific Company *and its assigns* the right of way through any lands belonging to the State of Oregon, etc.

"The following act is posterior to the litigation in this case, viz., '*An act to provide for the completion of the narrow-gauge system.*' (24 Feb., 1885.) It recites the Oregonian Railway Co.'s Act of 22 Oct. 1880, and proceeds: *Whereas,* said Oregonian Railway Company, Limited, did, on the 1st day of August, 1881, then lease its constructed lines of railway in the Willamette Valley to the Oregon Railway and Navigation Company for the period of ninety-six years, etc "

by the express language of the act of incorporation; so that the defendant's contention practically is that its own articles of incorporation are illegal and void. The same considerations apply to the objection that the lease was *ultra vires* as to the plaintiff. Both companies are incorporated under general laws, by articles of essentially the same character, purporting to contain in each case the powers which are here challenged.

The law of Oregon authorizes corporations for any lawful business, enterprise, pursuit or occupation. This corporation is created under that law for the lawful business of leasing and operating a railroad in that State. The whole case of the defendant rests on a misapprehension of the rule laid down by this court in *Railroad Co.* v. *Thomas*, 101 U. S. 71. There the company was created under a special act of the legislature, which gave it power to *construct and operate*, but not *to lease;* and the court held that a lease of the company was *ultra vires.* "The powers of corporations," says Mr. Justice Miller, "organized under legislative statutes are such, and such only, as those statutes confer. The charter of a corporation is the measure of its powers, and the enumeration of these powers implies the exclusion of all others." Had the defendant's articles been silent as to leasing, this case might have been cited as an authority against the validity of the lease, but with the articles as they are, it is an authority for the lease ; and so, indeed, is every other case in the United States and England in which the contract of a corporation has been declared *ultra vires.*

The decision in *Railroad Co.* v. *Thomas* is avowedly based on the case of *Ashbury Railway Carriage Co.* v. *Riche*, L. R. 7 H. L. 653; and Mr. Justice Miller adopts the language used in that case. That case followed a long line of English cases in which companies organized under special acts were held incompetent to make contracts not falling within their purposes as defined by such acts. But that case has great value in the present controversy, inasmuch as, unlike its predecessors, but like this case, it concerns the power of a company incorporated, not by special act, but by articles of incorporation under a general act. The decision in that case assumes

that the memorandum of association is the equivalent of a legislative charter. It was so held by Lord Selborne and by Lord Cairns, and their declarations are repeated and commented on in *Railroad Co.* v. *Thomas.* See also *Pennsylvania Railroad* v. *St. Louis, Alton &c. Railroad,* 118 U. S. 290.

These decisions, the only ones relied on, show that the disputed power is contained in the charter. The defendant is then driven to attack the charter. In the vague proposition that a lease of a railroad is contrary to public policy lies its whole case, inasmuch as by the general law of Oregon, anything may be leased, including a railroad.

. That a lease of a railroad without power to that intent conferred upon the company making the lease is against public policy, may be admitted on the ground that it involves an abandonment of franchise and duty. But what has to be established here is, not that a lease without authority of the State is bad, but that a lease is in itself an unlawful purpose, business, or enterprise; because, if it is a lawful purpose, business or enterprise, then the State has conferred the power on both companies.

At common law corporations could be created by the king for any purpose, and with any powers not contrary to general law, including that of leasing or taking in lease. See *Sutton's Hospital Case,* 10 Rep 1, 30 b. Under the Oregon corporation laws, a corporation has powers analogous to those of a corporation at common law, created by the king. In the analogous system of England under the Companies' Act, it has been held that the power of leasing is implied, although not specified in the memorandum of association. *Featherston* v. *Lee Moor Porcelain Co.,* L. R. 1 Eq. 318.

In the laws of Oregon there is no public policy hostile to leasing. The constitution prohibits incorporation except under general laws. The general law, like the law of Great Britain, provides one code for all kinds of corporations. It defines the powers of such corporations including the power to "dispose of" their property. This power of disposition is again mentioned in the section which provides for the dissolution of corporations. As Judge Deady in the court below observes,

the power to "dispose" implies a corresponding power in corporations to take. Again, we submit, although it is not necessary for our case that these provisions may reasonably be construed as meaning that the power to acquire or assign, by lease or otherwise, is incident to all corporations, whether leasing be assumed as an object in the articles of incorporation or not. See *Miners' Ditch Co.* v. *Zellerbach*, 37 California, 543; *S. C.* 99 Am. Dec. 300.

In its original form § 20 of the corporation laws of Oregon prohibited the leasing of railroads to a certain class of corporations, and thereby, by implication, permitted it to all others. In its amended form this prohibition was withdrawn, and leasing became thereby open to all.

Finally the act of 1880 granting certain rights and interests to the Oregonian Railway Company and its assigns, is inconsistent with a policy hostile to leasing. Not only is the grant made to the company and *its assigns*, but the company's right to assign the whole property is recognized, and it is enacted that certain of the rights granted by the act shall be assignable *only with the whole railroad property of the grantee.* This statute is cited here only as part of the proof which negatives the theory of a public policy hostile to leasing. Its importance in other respects is noticed elsewhere. See on these points, *Oregon Cascade Co.* v. *Baity*, 3 Oregon, 164; *Fink* v. *Canyon Road Co.*, 5 Oregon, 301; *Branson* v. *Oregon Railway Co.*, 10 Oregon, 278.

The defendant company is not entitled to challenge the legality of its own articles of incorporation, or to repudiate as unlawful a purpose which it was formed to carry out. See *Ewing* v. *Robeson*, 15 Indiana, 26; *Dooley* v. *Cheshire Glass Co.*, 15 Gray, 494; *Darge* v. *Horicon Co.*, 22 Wisconsin, 417; *Racine &c. Railroad Co.* v. *Farmers' Loan and Trust Co.*, 49 Illinois, 331; *S. C.* 95 Am. Dec. 595.

II. The defendant is estopped from denying our corporate existence and powers.

The defendant's answer admits the contract as pleaded, *i.e.*, the admission that it was signed by the defendant's president and secretary, sealed with the corporate seal, and

authorized by the board of directors, is an admission of the contract as pleaded. The allegation that the rent provided for was paid for three years is in itself an admission of the lease and of the existence between plaintiff and defendant of the relations of landlord and tenant. The contract as pleaded is a contract between the Oregonian Railway Company Limited and the defendant. The lease as pleaded is a lease by the Oregonian Railway Company Limited.

The rule applicable to this state of facts is laid down in Field on Corporations (Wood's edition) in the following terms: "When the action is brought by the corporation on a contract executed by the defendant to it, the general rule is that the plaintiff need not offer to prove its corporate existence, and the defendant is estopped from denying it in the absence of fraud on the part of the corporation; and when a party is estopped from denying the existence of a corporation at the time he recognized it as such, if he denies its existence subsequently he must show how it ceased to exist." See also Hubbard v. Chappel, 14 Indiana, 601; Jones v. Cincinnati Type Foundry, 14 Indiana, 89; Dutchess Cotton Manufacturing Co. v. Davis, 14 Johns. 238; S. C. 7 Am. Dec. 459; Cowell v. Springs Co., 100 U. S. 55; Commissioners v. Shield, 62 Missouri, 247; Evansville Railroad v. Evansville, 15 Indiana, 395; Heaston v. Cincinnati and Fort Wayne Railroad, 16 Indiana, 275; S. C. 79 Am. Dec. 430; Brownlee v. Ohio and Indiana Railroad, 18 Indiana, 68; Douglas County v. Bolles, 94 U. S. 104; Methodist Church v. Pickett, 19 N. Y. 482; Swartwout v. Michigan Railroad, 24 Michigan, 389; Kennedy v. Cotton, 28 Barb. 59; Phœnix Bank v. Donnell, 41 Barb. 572; Jones v. Bank of Tennessee, 8 B. Mon. 122; S. C. 46 Am. Dec. 540; Helena v. Turner, 36 Arkansas, 577; Mutual Ins. Co. v. Wilcox, 8 Bissell, 203; Franz v. Teutonia, 24 Maryland, 251; Cahill v. Kalamazoo Ins. Co., 2 Doug. (Mich.) 124; S. C. 43 Am. Dec. 457.

It was suggested by the defendant in the court below that the estoppel is limited to alleged defects of organization. No such limitation is inferred or implied in any of the cases, but the true rule is that, while a party is not estopped to show

that the corporation could have no legal existence, yet if the court knows, judicially or otherwise, (as by admission in the pleadings,) that there is a law under which it might exist, then the fact of contracting with the corporation estops the party from denying its corporate capacity.

It happens that the law under which the plaintiff claims to exist is fully before the court. Defendant expressly admits the British Companies' Act, 1862, as pleaded. The court itself knows the Oregon law, 1878, (p. 95,) under which it may lawfully engage in railroad business in Oregon, and the further act of 1880, (p. 56,) which expressly recognizes the plaintiff as a corporation lawfully engaged in such business, and grants to it and its assigns certain rights and privileges therein. The British law of its creation, whereby a company may be created for any lawful purpose; the Oregon law under which it may act in Oregon; the Oregon law, recognizing its lawful existence under its corporate name, and granting it facilities for its corporate business; the contract in its corporate name with the defendant; all these conditions show a *de facto* corporation, using corporate rights under a law which permits its existence, and raise an estoppel against persons dealing with it which is absolute.

Against this full recognition by the legislature no plea questioning the plaintiff's corporate existence or power can be of any avail. Such recognition was long ago held by this court to be conclusive as to the corporate character, and to give the power in question, even if not possessed before. *Society for the Propagation of the Gospel* v. *Pawlet*, 4 Pet. 480. See also *Jameson* v. *People*, 16 Illinois, 257; *S. C.* 63 Am. Dec. 304; *Kanawha Coal Co.* v. *Kanawha and Ohio Coal Co.*, 7 Blatchford, 391.

MR. JUSTICE MILLER delivered the opinion of the court.

The two questions presented on this demurrer, and the only ones necessary to be considered, are:

First. Whether the plaintiff, the Oregonian Railway Company, Limited, organized under the laws of Great Britain,

with such aid as the statute of Oregon gives to it in reference to business done in that State, had the power to lease its railroad to the defendant company; and,

. Second. Whether the Oregon Railway and Navigation Company, the defendant in the action, organized under the laws of the State of Oregon, had the legal capacity and lawful power to make said lease on its part.

Although the lease itself, which is the foundation of this action, is not found in the pleadings, nor in the record, the statements in regard to it made by the petition, amended petition and answers leave no question as to its nature or character so far as it affects the two questions here suggested.

It may be considered as the established doctrine of this court in regard to the powers of corporations, that they are such and such only as are conferred upon them by the acts of the legislatures of the several States under which they are organized. A corporation in this country, whatever it may have been in England at a time when the crown exercised the right of creating such bodies, can only have an existence under the express law of the State or sovereignty by which it is created. And these powers, where they do not relate to municipal corporations exercising authority conferred solely for the benefit of the public, and in some sense parts of the body politic of the State, have in this country until within recent years always been conferred by special acts of the legislative body under which they claim to exist. But the rapid growth of corporations, which have come to take a part in all or nearly all of the business operations of the country, and especially in enterprises requiring large aggregations of capital and individual energy, as well as their success in meeting the needs of a vast number of most important commercial relations, have demanded the serious attention and consideration of law makers. And while valuable services have been rendered to the public by this class of organizations, which have stimulated their formation by numerous special acts, it came at last to be perceived that they were attended by many evils in their operation as well as much good, and that the hasty manner in which they were created by the legislatures, sometimes with

exclusive privileges, often without due consideration and under the influence of improper motives, frequently led to bad results.

Whether it was this consideration, or mainly the desire to fix some more uniform rule by which the rights and powers of private corporations, or those for pecuniary profit, should come into existence, it is certain that not many years ago state constitutions which were formed or remodelled came to have in them a provision like that which is now to be found in the constitution of the State of Oregon, article 11, § 2:

" Corporations may be formed under general laws, but shall not be created by special laws, except for municipal purposes. All laws passed pursuant to this section may be altered, amended, or repealed, but not so as to impair or destroy any vested corporate rights."

Outside of the powers conferred and the privileges granted to those organizations by the statutes under which they exist, they are in all the States of the Union, which like Oregon have the common law as the foundation of their jurisprudence, governed by that common law; and it is the established doctrine of this court, and, with some exceptions, of the States in which that common law prevails, as well as of Great Britain, from which it is derived, that such a corporation can exercise no power or authority which is not granted to it by the charter under which it exists, or by some other act of the legislature which granted that charter.

This proposition has been before this court more than once in recent years. It was very fully considered in *Thomas* v. *Railroad Co.*, 101 U. S. 71, which resembled the case before us in several important features.

The Millville and Glassboro Railroad Company, incorporated under the laws of New Jersey, entered into an agreement with Thomas and others for the lease of its railroad to them for twenty years. It was agreed that the company might at any time terminate the lease and retake possession of the railroad; in which case any loss or damage incurred by the lessees should be equitably adjusted by arbitration, and the amount be paid by the company. This contract was made in 1859, and the les-

sees took control of the property and used it until 1867, when they were served with a notice by the lessor terminating the lease. A suit was brought to recover the damages mentioned in the contract, which came from the Circuit Court of the United States for the Eastern District of Pennsylvania to this court, where it was very elaborately argued, and received the earnest consideration of the court, as may be perceived from the report of the case. The opinion, which was concurred in by all the judges who sat in the case, contains a full review of the decisions of the English courts on the subject discussed, and also of previous decisions of this court.

The question turned altogether upon the power of the railroad company, under its charter and the laws of New Jersey, to make the lease by which its road was turned over for twenty years to the absolute control of other parties. The right to do this was asserted under the following language in the charter of the company:

"That it shall be lawful for the said company, at any time during the continuance of its charter, to make contracts and engagements with any other corporation, or with individuals, for the transporting or conveying any kind of goods, produce, merchandise, freight, or passengers, and to enforce the fulfilment of such contracts."

But the court said it was impossible under any sound rule of construction to find in this language a permission to sell, lease, or transfer to others the entire railroad and the rights and franchises of the corporation.

The cases of *The Asbury Railway Carriage & Iron Co.* v. *Riche*, L. R. 7 H. L. 653, decided in the House of Lords in 1875, and *The East Anglian Railways Co.* v. *The Eastern Counties Railway Co.*, 11 C. B. 775, were also reviewed, with several others of a similar character from the reports of the highest courts of England, in which, as this court said:

"The broad doctrine was established that a contract not within the scope of the powers conferred on the corporation cannot be made valid by the assent of every one of the shareholders, nor can it by any partial performance become the foundation of a right of action."

Reference was also made in the same opinion to the case of *The York & Maryland Line Railroad Co.* v. *Winans*, 17 How. 30, which held that a corporation which has undertaken to construct and operate a railroad cannot, by alienating its right to use and its powers of control and supervision, avoid the responsibility that it assumed in accepting the charter. The court said: "The corporation cannot absolve itself from the performance of its obligations without the consent of the legislature." To this effect were cited *Beman* v. *Rufford*, 1 Sim. (N. S.) 550, and *Winch* v. *Birkenhead & Lancaster Railway Co.*, 6 Jurist, 1035; *S. C.* 13 Eng. L. & Eq. 506.

Afterwards, in *Green Bay & Minnesota Railroad* v. *Union Steamboat Co.*, 107 U. S. 98, the case of *Thomas* v. *Railroad Co., supra*, was referred to with approbation.

Still later, in the case of *Pennsylvania Railroad Co.* v. *St. Louis &c. Railroad Co.*, 118 U. S. 290, 309, where the whole question was reconsidered after a full argument, the conclusion was stated in the following language:

"We think it may be stated, as the just result of these cases and on sound principle, that unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease or any other contract, turn over to another company, for a long period of time, its road and all its appurtenances, the use of its franchises, and the exercise of its powers, nor can any other railroad company without similar authority make a contract to receive and operate such road, franchises and property of the first corporation, and that such a contract is not among the ordinary powers of a railroad company, and is not to be presumed from the usual grant of powers in a railroad charter."

It may be considered that this is the law of the State of Oregon, except as it has been altered or modified by its constitution and statutes.

We are here met with an embarrassment arising out of the circumstance that neither the plaintiff nor the defendant in the present case professes to exercise its powers under any special charter conferred on it by the legislature of Oregon. That State, in accordance with the principle laid down in its con-

stitution, to which we have already referred, passed general laws for the formation of private corporations. See Laws of Oregon, (Deady's Comp.) c. 8. Under title 1, § 1 reads as follows:

"Whenever three or more persons shall desire to incorporate themselves for the purpose of engaging in any lawful enterprise, business, pursuit, or occupation, they may do so in the manner provided in this act."

Provision is then made for the manner in which these persons shall constitute themselves a corporation, by filing articles of association, acknowledged before a proper officer, in the office of the Secretary of State and in that of the clerk of the county where the business is to be carried on. What these articles shall contain is specified with some particularity. But title 2 of this same chapter is more important in regard to the matter at issue, because it relates, among other things, to corporations which are organized for the construction of railroads. The mode of their formation is the same as that of those coming under title 1, but the declaration of the powers which may be exercised by railroad corporations may become important in the consideration of the present case.

By the act of the legislature of October 21, 1878, Session Laws, 95, it is provided "that any foreign corporation incorporated for the purpose of constructing, or constructing and operating, or for the purpose of, or with the power of, acquiring and operating any railway, . . . shall, on compliance with the laws of this State for the regulation of foreign corporations transacting business therein, have the same rights, powers and privileges" as a domestic corporation formed for such purpose, and no more.

When we have found, therefore, what powers were conferred by the laws of Oregon on the defendant corporation in this case we shall also have determined that the powers of the plaintiff corporation were no greater with regard to the same subject matter, so far as the statutes are concerned, except as it may be shown that other powers are given by some express statute.

It may also be conceded, at the outset of the argument, that the memorandum made under the Companies' Act of 1862 by

the plaintiff, and the articles of association made under the laws of Oregon by the defendant, both contain declarations of the powers of these companies and of each of them to buy or sell or lease railroads. The only question, therefore, to be considered is whether this declaration of power is authorized by the laws of Oregon.

It is argued that the articles of association, under the Oregon law, and the memorandum of association, under the Companies' Acts of Great Britain, are themselves the equivalent of an act of incorporation by the legislature, and that whatever is found as a grant of power, or description of the purpose of the company, set forth in such articles or memorandum, is tantamount to a legislative act. A phrase in the opinion of the court in *Thomas* v. *Railroad Co., supra*, is cited as supporting this proposition, namely, " The memorandum of association, as Lord Cairns said, stands in place of a legislative charter." But what was meant, both by Lord Cairns and by this court, was that anything not claimed, granted, or described in such instrument in relation to the powers and business of the corporation could not be held to be a part of them by construction; in other words that its powers could not exceed those enumerated therein. It was necessarily implied in such a remark that anything in such articles or memorandum not warranted by the statutes in question, authorizing the formation of corporate bodies, was void for want of authority.

Of course any authority for the exercise of corporate powers, derived from the laws of Oregon, must be in accord with the constitution of that State and its statutes upon that subject. The constitutional provision, above quoted, that corporations shall not be created by special laws, but may be formed under general laws, implies that no private corporation could be created thereafter until such general law had been enacted, and that it thereupon became the fundamental law of the State in regard to all corporations formed under it. It is idle to say, therefore, that any corporation could assume to itself powers of action by the mere declaration in its articles or memorandum that it possessed them.

We have examined with much care the two statutes already

referred to concerning incorporation, enacted in accordance with that constitutional provision, and do not find any express authority for a railroad company to lease its road for an indefinite period, or for it to take such a lease; nor are we able to find any general language in those statutes, or either of them, in relation to the powers that may be conferred upon corporations which justifies a departure from the principles laid down in *Thomas* v. *Railroad Co.*

It is to be remembered that where a statute making a grant of property, or of powers, or of franchises, to a private individual, or a private corporation, becomes the subject of construction as regards the extent of the grant, the universal rule is that in doubtful points the construction shall be against the grantee and in favor of the government or the general public. As was said in the case of *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, "in this court the principle is recognized that in grants by the public nothing passes by implication." See also *Dubuque and Pacific Railroad Co.* v. *Litchfield*, 23 How. 66; *Turnpike Co.* v. *Illinois*, 96 U. S. 63.

Therefore if the articles of association of these two corporations, instead of being the mere adoption by the corporators themselves of the declaration of their own purposes and powers, had been an act of the legislature of Oregon conferring such powers on the corporations, they would be subject to the rule above stated and to rigid construction in regard to the powers granted. How much more, then, should this rule be applied, and with how much more reason should a court, called upon to determine the powers granted by these articles of association, construe them rigidly, with the stronger leaning in doubtful cases in favor of the public and against the private corporation.

We have to consider, when such articles become the subject of construction, that they are in a sense *ex parte;* their formation and execution — what shall be put into them as well as what shall be left out — do not take place under the supervision of any official authority whatever. They are the production of private citizens, gotten up in the interest of the parties who propose to become corporators, and stimulated by their zeal

for the personal advantage of the parties concerned rather than the general good.

These articles, when signed by the corporators, acknowledged before any justice of the peace or notary public, and filed in the office of the Secretary of State and the clerk of the proper county, become complete and operative. They are, so far as framed in accordance with law, a substitute for legislation, put in the place of the will of the people of the State, formerly expressed by acts of the legislature. Neither the officer who takes such acknowledgment, nor those who file the articles, have any power of criticism or rejection. The duty of the first is to certify to the fact, and of the second to simply mark them filed as public documents, in their respective offices.

These articles, which necessarily assume by the sole action of the corporators enormous powers, many of which have been heretofore considered of a public character, sometimes affecting the interests of the public very largely and very seriously, do not commend themselves to the judicial mind as a class of instruments requiring or justifying any very liberal construction. Where the question is whether they conform to the authority given by statute in regard to corporate organizations, it is always to be determined upon just construction of the powers granted therein, with a due regard for all the other laws of the State upon that subject, and the rule stated above.

It is not urged with much apparent confidence that there is anything in the general provisions of the laws of Oregon, in relation to the formation of private corporations, which are to be found in c. 8, titles 1 and 2, Deady's Comp., which by express terms authorizes a corporation to include within the powers enumerated in its articles of association, that of making such a lease as the one which is the subject of this action. Arguments based upon these laws are founded upon the implication that building railroads is, within the meaning of § 1 of title 1, a "lawful enterprise, business, pursuit or occupation;" and the further inference that the power of leasing a railroad, either as a lessor or a lessee, is one which is incident and proper to the pursuit of the lawful business of

constructing and operating a railroad. The same argument is drawn from the general fact that title 2 recognizes the authority of corporations organized for the construction of railroads, macadamized roads, plank roads, clay roads, canals or bridges, to appropriate lands for their necessary uses by the exercise of the right of eminent domain, in the manner pointed out.

The language of the statute of New Jersey, (quoted in *Thomas* v. *Railroad Co.*, *supra,*) under which it was urged that the railroad company had authority to make the lease in controversy, was quite as general and as liberal in its description of the powers which that corporation was authorized to exercise as anything to be found in the Oregon statutes. In fact, in the authority which was given to that company in regard to making contracts for the transportation of passengers and freight, and the doing of a general railroad business with other corporations and private persons, it approaches nearer the power to make leases than anything which is to be found in the laws of Oregon; yet this court held that although it was a direct authority from the legislature itself, and not subject to the restrictive criticisms above suggested, the lease made in that case was *ultra vires*, and without authority on the part of the company.

Another important consideration to be observed, peculiarly applicable to the acts of corporations formed by the corporators themselves, declaring what business they are about to pursue, and the powers which they purpose to exercise in carrying it on, is, that while the thing to be done may be lawful in a general way, there are and must be limitations upon the means by which it is to be done or the purpose carried out, which the articles of incorporation cannot remove or violate. A company might be authorized by its articles to establish a large manufactory in a particular locality, and might be held to be a valid incorporation with sufficient powers to prosecute the business described; but such articles, although mentioning the particular place, would not empower the company, in the exercise of the power thus conferred, to carry on a business injurious to the health or comfort of those living in that vicinity.

Instances might be multiplied in which powers described in general terms as belonging to the objects of the parties who thus become incorporated would. be valid; but the corporation, in carrying out this general purpose, would not be authorized to exercise the powers necessary for so doing in any mode which the law of the State would not justify in any private person or any unincorporated body. The manner in which these powers shall be exercised, and their subjection to the restraint of the general laws of the State and its general principles of public policy, are not in any sense enlarged by inserting in the articles of association the authority to depart therefrom.

In the absence of anything in the general incorporation act, we are referred to several statutes of the State of Oregon, which, while not specifically granting to railroad companies the right to lease their property or to take other railroads under lease from their owners, are supposed by implication to recognize such right in all railroad companies. We are furnished with a list of statutes of that State in which the word "assigns" is used in regard to corporations, generally in the phrase "successors or assigns," from which it is sought to imply the general proposition that a corporation may assign all its property. A special reference is made to the act of October 22, 1880, by which the legislature granted to the "Oregonian Railway Company, Limited, the right of way and station grounds over the state lands, and terminal facilities upon the public grounds at the city of Portland."

The preamble to this statute is quite lengthy, and, taken in connection with the enacting clause, shows very plainly that the principal object aimed at was to give to that company, so far as the legislature could do so, certain rights, privileges and easements upon the public grounds, streets and levee in that city, on and near the banks of the Willamette River, for its depots and wharves and the operation of its railroad. After these are fully specified, a proviso is added, "That the said Oregonian Railway Company, Limited, or its assigns, shall have no power to sell, convey, or assign the premises or rights *hereby granted,* or any part or parcel thereof, to any person,

persons, firm or corporation, save only with and as part and parcel of and as appurtenant to the railway now built and owned by said company and now in process of construction by it."

It is strenuously argued, and with some degree of plausibility, that the language of this proviso, and the use of the words " successors " and " assigns " in other statutes, which are referred to, imply that by the law of Oregon railroad companies may make, and must be supposed to be capable of making, assignments. But whatever may have been the intent in the minds of the legislators in using these words, it is not precisely the form in which we would expect to find a grant of the power to sell, to lease, or to transfer the title, ownership, or use of railroad lines, the property belonging thereto, and the franchises necessary to carry them on, by one corporation to another.

One of the most important powers with which a corporation can be invested is the right to sell out its whole property together with the franchises under which it is operated, or the authority to lease its property for a long term of years. In the case of a railroad company these privileges, next to the right to build and operate its railroad, would be the most important which could be given it, and this idea would impress itself upon the legislature. Naturally, we would look for the authority to do these things in some express provision of law. We would suppose that if the legislature saw fit to confer such rights it would do so in terms which could not be misunderstood. To infer, on the contrary, that it either intended to confer them or to recognize that they already existed, by the simple use of the word " assigns," a very loose and indefinite term, is a stretch of the power of the court in making implications which we do not feel to be justified.

The legislators who enacted these statutes may have had an idea that there were certain things which corporations could assign ; they may have used the expressions to which we have referred in a very loose instead of a technical sense ; or they may have supposed that cases might arise where railroad property going by some operation of law, as bankruptcy or fore-

closure, from the hands of its original owners into the possession of other persons, would justify the description of the latter by the words "successors or assigns." In using these terms they may have thought that authority might be given by future statutes, either generally to all corporations or to some special organization, to sell or transfer the corporate property or some part of it. But whatever may have been their purpose, we think the argument is a forced one, which would vest in railroad companies the general power to sell or lease their property or franchises, or to make contracts to buy or take leases of the same from other railroad corporations, from the use which is made of these indefinite terms "successors or assigns."

This question came up in *Thomas* v. *Railroad Company, supra,* in which, as already stated, a lease by the railroad company of its road and corporate franchises was held to be void. While the lease was in full operation, an act was passed by the legislature of New Jersey declaring it unlawful for the directors, lessees, or agents of that railroad company to charge more than three and a half cents per mile for the carrying of passengers. It was insisted that this use of the word "lessees" applied to the then existing lessees of that road, and operated as a ratification by the state legislature of the lease under which they held it. In discussing this subject the court said:

"It may be fairly inferred that the legislature knew at the time the statute was passed that the plaintiffs were running the road, and claiming to do so as lessees of the corporation. It was not important for the purpose of the act to decide whether this was done under a lawful contract or not. No inquiry was probably made as to the terms of that lease, as no information on that subject was needed.

"The legislature was determined that whoever did run the road and exercise the franchises conferred on the company, and under whatever claim of right this was done, should be bound by the rates of fare established by the act. Hence, without undertaking to decide in whom was the right to the control of the road, language was used which included the directors, lessees and agents of the railroad.

."The mention of the lessees no more implies a ratification of the contract of lease than the word 'directors' would imply a disapproval of the contract. It is not by such an incidental use of the word 'lessees,' in an effort to make sure that all who collected fares should be bound by the law, that a con-- tract unauthorized by the charter, and forbidden by public policy, is to be made valid and ratified by the State."  p. 85.

This language applies with great force to the attempt which is made in this case to deduce from the use of the word "assign" in the act of October 22, 1880, a recognition of the power of the railroad company to sell or assign its entire property and rights. The object of the legislature in making the proviso to that statute was to make sure that the grant given to the Oregonian Company of terminal facilities as they are called, with the right to wharves, depots, and access to the river for the use of the road, should never be separated by sale, assignment, or otherwise from the road itself, and that into whosesoever hands the road went should also go the rights, powers and privileges conveyed by the grant. Without these prohibitory words it is possible the company might have had power to sell or assign the depot or wharves granted, while without the authority to do either in regard to the rights or franchises of which they were already possessed. Hence, they used a term which they supposed in a general way might cover any transfer of the ownership by the railroad company of the grants made to it by the statute, whether by operation of law or otherwise. If the property should be sold out under a mortgage or deed of trust, or any other instrument which the company might possibly have had the power to make to purchasers who might be called "assigns" under such pro- ceedings, there should also go with it the grant made by the statute.

The language used in the statute in question in this case is stronger than that in other cases cited to us by counsel, and we are of opinion that they do not, any of them, nor do they collectively, establish the proposition, that by the laws of Oregon a railroad company could sell or lease its entire prop- erty, franchises and powers to another company, or take a

grant or lease of similar property or franchises from any other person or company.

The attempt is made to sustain the proposition here contended for in regard to the power to lease, by another inferential process of reasoning which we think equally untenable.

The following provision is found in c. 8, title 1:

" Sec. 20. Any corporation formed for the purpose of navigating any stream or other water may, by virtue of such incorporation, construct any railroad, macadamized road, plank road, or clay road, or canal or bridge, necessary and convenient for the purpose of transporting freight or passengers across any portages on the line of such navigation, occasioned by any rapids or other obstructions to the navigation of such stream or other water, in like manner and with like effect as if such corporation had been specially formed for such purpose; but no corporation formed under this act or heretofore or hereafter incorporated by any special act of incorporation, passed by the legislative assembly of this State or otherwise, for the purpose of navigating any stream or other water of this State, or forming the boundary thereof in whole or in part, nor any stockholder in such corporation, shall ever take or hold stock, or any interest directly or indirectly in the stock of any corporation which may be formed under this act, for the purpose of building or constructing any road in this act mentioned; nor shall any such corporation ever purchase, lease, or in any way control such road or the corporate rights of such last-named corporation."

It is argued that this prohibition against leasing the railroad is a recognition of the fact that such a power would have existed if it had not been forbidden by this statute; but as the language of the whole section relates to the competition which may exist or arise between corporations organized for the purpose of navigating streams or other waters, when they may find it convenient to construct a road across such portages on the line of their navigation as may be required to carry over goods and property from one navigable water to another, we do not see that it has any effect in establishing such a general principle.

From the simple fact that in the revision of this law all reference to leases was omitted, it is argued that the general power of leasing one road by another wherever situated, without reference to its competition with roads owned by navigation companies, amounts to a restoration of the power to lease or accept leases on the part of any railroad company in the State, of all its road, of all its franchises, of all its property, for an indefinite length of time.

As to this we can only say that the original section, relating solely to a peculiar class of objects, namely, the construction of roads across portages by corporations navigating the waters of the State, and forbidding by its last clause the purchase, lease, or control of such portage road or the corporate rights acquired by them, was necessarily limited to that class of roads, and the repeal or modification of so much of the section as related to the power to lease could have no effect to declare that all railroads in the State of Oregon had the power to make contracts of lease, either as lessors or lessees.

One other provision of the laws of Oregon, immediately preceding the section just discussed, is also relied upon as establishing the right of a corporation to sell all of its property, and therefore its right to the smaller or subsidiary power of leasing it. It is found under c. 8, title 1, as follows:

"SEC. 19. Any corporation organized under the provisions of this act may, at any meeting of the stockholders which is called for such purpose, by a vote of the majority of the stock of such corporation, increase or diminish its capital stock or the amount of the shares thereof, or authorize the dissolution of such corporation and the settling of its business and disposing of its property and dividing its capital stock: *Provided, however*, That the capital stock of any corporation formed under this act, except corporations formed for the purpose of making and constructing a railroad, shall never exceed the sum of two million of dollars, and any corporation that shall violate this provision of this act shall forfeit its corporate rights."

It is argued that because a corporation has authority to put an end to its existence by a vote of the majority of its stock-

holders, in which event it may proceed to settle up its affairs, *dispose of its property*, and divide its capital stock, therefore, a corporation in full operation, with no such purpose of terminating its existence, may, in the ordinary course of its business, sell all of its property, real and personal, and if it be a railroad company dispose of its road, its franchises, and the powers necessary to properly carry on the business of a carrier. It is insisted that if it can do this, it may, therefore, make a lease of such property and franchises, transferring all those powers, rights and privileges.

But it does not need argument to show that such provision, made for the dissolution of a corporation by the voluntary act of its incorporators, providing for the disposition of its property when the resolution to that effect has been adopted, whether by distribution of dividends on its profits or the sale of shares of stock, or for any other disposition of its effects compatible with law, is not applicable to and cannot be intended to confer upon corporations continuing in existence, or which, like these companies, contemplate in the very contract entered into a continuance of more than ninety-six years, the power to dispose of their corporate powers and franchises, much less the authority to lease them for an indefinite period to others.

In the case before us both corporations continued to exist; they both entered into contracts covering a period of ninety-six years; and if the contract of lease be valid, one of them obtained thereby the right to the control and use of the property and franchises of the other, which on its part became bound for the payment of rent therefor, a supposed profit on the capital for the entire period of the term. We can see no reason why the powers conferred upon a corporation going out of existence, and dissolved by its own act, including the right to wind up its affairs and dispose of its property, can be held to confer any such power on a company which contemplates an existence of a hundred years to come.

Nor does there appear to be any force in the objection that if an Oregon corporation cannot acquire the right to take a lease of a railroad under the existing general laws, it cannot acquire

it at all, the legislature being prohibited by the constitution from granting special charters of incorporation, and therefore, it is said, it has no authority to grant special privileges to a particular corporation — a proposition we are not prepared to concede to its fullest extent.  But assuming, without deciding, that it is true that the legislature cannot grant the right to a particular railroad company to make or to take a lease of the railroad of another company, it would be clearly within its power to confer by general laws on all railroad corporations within the State the powers to make and to take leases, which powers are claimed by the plaintiff to exist under the general law of Oregon as it now stands.

The reasons for holding that the Oregonian Company had no power to make the lease of its railroad are even stronger than those for holding that the Oregon Railway and Navigation Company had no power to take the lease.

In the first place, even if a domestic railroad corporation established under the general laws of Oregon could be construed as entitled to assume by its articles the power of taking leases of other railroads as incident to and in connection with operating its own road, it would by no means follow that such a corporation could assume the power of leasing its whole railroad for a term of years to another corporation, and thereby substantially abandon and transfer its whole corporate rights and franchises.

The Oregonian Company is a foreign corporation, and the general laws of Oregon do not give a foreign corporation the right to lease, but only to construct or acquire and operate a railroad within the State.  The only statute relied on as giving the power to lease (except those already considered) is the general law of Oregon of 1878, Laws of Oregon, p. 95, which clearly does not include or touch that power.  The first section, while it includes, among the classes of foreign corporations therein particularly enumerated, "any foreign incorporation incorporated for the purpose of constructing, or constructing and operating, or for the purpose of or with the power of acquiring and operating, any railway," significantly omits corporations established for the purpose of selling or leasing their

roads, instead of operating them themselves; and this section gives to those classes of foreign corporations therein enumerated only "the same rights, powers and privileges in the exercise of the rights of eminent domain, collection of tolls and other prerogative franchises as are given by the laws of this State to corporations organized within this State, for the purpose of constructing any railway," or for one of the other purposes already specified, of which the making of leases is not one. And the second section, merely providing that nothing in the act contained shall be so construed as to give to foreign corporations any other or further rights than may be acquired or exercised by domestic corporations, but only to give them the same as domestic corporations may acquire or exercise, is evidently limited to the classes, both of foreign and domestic corporations, specified in the first section.

Under this statute, in short, foreign corporations created for the purpose of leasing get no power at all, and no foreign corporation gets any power to sell or lease its road.

Another argument relied upon by counsel for the defendant in error is that, within the principles laid down in certain cases on the subject, the contract here is so far an executed one that the plaintiff in error is estopped to deny its validity and to refuse to continue its performance. As already stated, the contract was one by which the plaintiff demised its road, privileges and franchises, for a period of ninety-six years, from the 1st of August, 1881, to the defendant, who took possession of it, and used and occupied it, under the lease, until the 15th day of May, 1884, a period of less than three years. It then did what was equivalent to returning the property to the plaintiff, and refused to be further bound by the contract.

To say that a contract which runs for ninety-six years, and which requires of both parties to it continual and actual operations and performance under it, becomes an executed contract by such performance for less than three years of the term, is carrying the doctrine much farther than it has ever been carried, and is decidedly a misnomer. This class of cases is not governed by the doctrine of part performance in a suit in equity for specific performance, nor is this a suit for specific perform-

ance.  This is an action at law to recover money under a
contract which is. void, where for nearly three years the
parties acted under it, but in which one of them refuses longer
to be bound by its provisions; and the argument now set up
is that because the defendant has paid for all the actual use it
made of the road while engaged in the actual performance of
the contract between the dates just given, it is thereby bound
for more than ninety-three years longer by the contract which
was made without lawful authority by its president and board
of directors.  We consider this proposition as needing no fur-
ther consideration, except a reference to the discussion of the
same subject in *Thomas* v. *Railroad Company.* and *Pennsylva-
nia Railroad Co.* v. *St. Louis &c. Railroad Co.*, already cited.

> *The judgment of the Circuit Court of Oregon is reversed,
> and the case is remanded to that court, with a direction to
> overrule the demurrer, and to take such further proceed-
> ings as shall be according to law, and not inconsistent
> with this opinion.*

MR. JUSTICE FIELD dissenting.

I am not able to agree with the majority of the court in the
decision of this case.  It seems to me clear that a railway cor-
poration of Oregon has the right under her laws to lease its
road to another corporation of like character.  A foreign cor-
poration, as is the plaintiff below, is by the act of October
21st, 1878, placed on the same footing with a domestic corpo-
ration, upon complying with the laws passed for the regulation
of such corporations transacting business in the State.  That
act declares that, upon such compliance, the foreign corpora-
tion shall have "the same rights, powers and privileges" as a
domestic corporation.

Besides, the act of October 22, 1880, entitled "An act to
grant the Oregonian Railway Company, Limited, the right of
way and station grounds over the state lands, and terminal
facilities upon the public grounds at the city of Portland,"
recognizes the plaintiff as an existing corporation, lawfully
engaged in the construction and operation of a railway in

Oregon,. "from Portland to the head of the Willamette Valley," and grants to it "and to its assigns" valuable "rights, privileges, easements and property," accompanied with a proviso that it shall have no power to sell, convey, or assign the premises or rights granted, or any part or parcel thereof, to any person or corporation, "save only with, and as a part and parcel of and as appurtenant to, the railway now built and owned by said company, and now in process of construction by it." As the court below observed, and it seems to me very justly, this implies that the plaintiff had the power to assign its road, and also the premises and rights thus granted to it in connection therewith, but not otherwise.

I cannot perceive what public policy of the State is sustained by denying to a foreign corporation, which has by her permission constructed a railway therein, the right to lease its road to a domestic corporation. It would rather seem, if any considerations of public policy are to control, that such policy would favor a transfer of the road from foreigners to her own citizens. When the transfer is made the State can exercise over the road, its management, and the charges for its use, the same authority which she could have previously exercised. And there is nothing in the articles of association which forbids the directors of the plaintiff from making such a transfer if the laws of Oregon permit it.

MR. CHIEF JUSTICE FULLER was not a member of the court when this case was argued, and took no part in this decision.