LEANDER J. McCORMICK

*v.*

THE MARKET NATIONAL BANK OF CHICAGO.

*Filed at Springfield June 11, 1896.*

1. BANKS—*power of national bank to execute lease before getting comptroller's certificate.* The provision of section 5134 of the National Banking act, that "no association shall transact any business, except such as is incidental and necessarily preliminary to its organization," until the comptroller has authorized it to commence the banking business, precludes such an association from leasing a banking house before the comptroller has acted.

2. SAME—*what is not a preliminary to the organization of a national bank.* The renting of rooms in which to conduct the banking business is not "incidental and necessarily preliminary" to the organization of a national banking association.

3. SAME—*construction of act as to place of business.* The requirement of the National Banking act that the organization certificate shall state the place where the bank's operations are to be carried on, has reference to the town or city, and not to the room, street or number in such town or city where the bank is to be located.

4. ESTOPPEL—*national bank not estopped to show its want of power.* A national bank which has not been authorized by the comptroller to do a banking business is not estopped from insisting upon its want of power to make a lease of a banking house.

*McCormick* v. *Market Nat. Bank,* 61 Ill. App. 33, affirmed.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. John Barton Payne, Judge, presiding.

Pence & Carpenter, for appellant:

The lease in question was incidental and necessarily preliminary to the commencement of a banking business. National Banking act, sec. 5136.

When power is given for a certain purpose, if such power is abused or used in excess in attaining such object, and was an improper exercise of judgment or discretion, such excess or abuse will not render the contract void. *Hayes* v. *Covington*, 21 Miss. 408; *Moss* v. *Averill*, 10 N. Y. 461; *Littlewort* v. *Davis*, 50 Miss. 403; *Ehrman* v. *Insurance Co.* 35 Ohio St. 324; *Mining Co.* v. *Baker*, 3 Nev. 386; *Bank* v. *Harrison*, 57 Mo. 503; *Hough* v. *Land Co.* 73 Ill. 23; *Alexander* v. *Tolleston Club*, 110 id. 65; *Barnes* v. *Sudden*, 117 id. 237; *Davis* v. *Railroad Co.* 131 Mass. 258.

A limitation upon a power granted will not render a contract within such limitation void, unless it appears affirmatively that such was the intention of the legislature. 2 Morawetz on Corp. secs. 660-666, 672, 710; *Bank* v. *Mathews*, 98 U. S. 621.

A *de facto* organization, as distinguished from a *de jure* organization, is never a good defense, provided the acts which are done by the corporation so organized would have been within its power had its organization ever been completed. *Tarbell* v. *Page*, 24 Ill. 46; *Price* v. *Railroad Co.* 21 id. 93; *Baker* v. *Backus*, 28 id. 32; *Thomas* v. *Candor*, 60 id. 244; *Bushnell* v. *Ice Machine Co.* 138 id. 67; *Railroad Co.* v. *Cary*, 26 N. Y. 77; *Chubb* v. *Upton*, 95 U. S. 665; *Express Co.* v. *Bradbury*, 34 Ill. 459.

Duncan & Gilbert, for appellee:

The lease in question, not being a contract fully executed by either party and being *ultra vires*, cannot be

enforced by the lessor as to so much of the term as had not expired at the time the officers of the bank offered to surrender. *Thomas* v. *Railroad Co.* 101 U. S. 71; *Railroad Co.* v. *Railroad Co.* 118 id. 290; *Railway Co.* v. *Railway Co.* 130 id. 1.

A person dealing with a corporation must, at his peril, take notice of the terms of its charter, and of the fact that acts in excess of the charter are necessarily in excess of the authority of the agent performing them. Morawetz on Corp. secs. 580, 591; Angell & Ames on Corp. 288, 301; *Alexander* v. *Cauldwell,* 83 N. Y. 480; *Davis* v. *Railroad Co.* 131 Mass. 258.

Per Curiam: "This was an action at law for recovery of rent due from July 22, 1893, up to May 1, 1895, at the rate of $13,000 per annum, or $1083.33 per month.

"The facts are shown by a stipulation, in part as follows: On January 31, 1893, certain parties made, under their hands, an organization certificate. for the organization of the Market National Bank of Chicago, duly acknowledged the same before a notary public, and sent it, authenticated by the seal of said notary, to the comptroller of currency of the United States, who duly recorded and carefully preserved the same in his office on February 3, 1893. A lease was made between Leander J. McCormick and the Market National Bank of Chicago, of certain offices in the Major Block, situated on the southeast corner of Madison and LaSalle streets, in the city of Chicago, to be used and occupied by said Market National Bank as a banking office, and for no other purpose, from May 1, 1893, to April 30, 1898, for $13,000 per annum, payable $1083.33 on the last day of each and every month during said term. Attached to said lease and made a part thereof was an agreement dated February 9, 1893, to the effect that certain improvements and changes should be made, and that both landlord and tenant should have the option, upon giving ninety days' notice in writing, to cancel the lease on May 1, 1895. On June 22, 1893, the

president and cashier of said Market National Bank of Chicago took possession of the premises leased to it under said lease from said Leander J. McCormick, possession of said premises up to that time having been retained by said McCormick with the consent and approval of the officers of said bank, for the purpose of putting them in a condition suitable for the occupation and use of said Market National Bank, which said Leander J. McCormick did in the manner provided in said lease. On the 22d day of June, 1893, the cashier of said National Bank paid to Leander J. McCormick the rent accruing under said lease down to the 22d day of July, 1893.

"The Market National Bank of Chicago was never authorized by the comptroller of the currency to commence the business of banking and never did commence the business of banking. Leander J. McCormick, at the time of the negotiations, prior to the execution of said lease, and at the time of the execution of said lease, and at the time when said officers of the Market National Bank of Chicago took possession of the demised premises on the 22d day of June, 1893, understood and believed that the Market National Bank of Chicago was duly and legally organized as a national bank, and that, as such, it was ready to do a banking business, and had the power to enter into said lease and the agreements and modification connected therewith, and had no knowledge or information to the contrary until August 15, 1893, when the officers of the bank informed him that the said bank had no power to enter into said lease, and offered to surrender both the demised premises and the lease. The officers of said bank at that time informed McCormick that the Market National Bank of Chicago had never been authorized by the comptroller of the currency to commence the business of banking. McCormick then and there refused to accept such surrender.

"The officers of the Market National Bank, prior to the 22d day of June, 1893, in pursuance of a resolution

of the board of directors of said bank purporting by its terms to authorize the same, agreed to share equally with said McCormick the cost of refitting the demised premises. The premises were changed, in accordance with said agreement, by said McCormick at a cost of $2475, which was paid by him and no part of which was ever repaid by the Market National Bank of Chicago.

"The officers of the Market National Bank, during the month of June, 1893, after having taken possession of the leased premises, put therein the necessary fixtures and furniture required for carrying on a banking business, also a quantity of blank books and stationery, which fixtures, furniture, blank books and stationery were not removed from said premises until April 30, 1895.

"On September 20, 1893, A. F. Seeberger caused to be left with R. Hall McCormick, the duly authorized agent of Leander J. McCormick, the key to said banking office, but said R. Hall McCormick refused at that time to accept the same or to accept a surrender of said lease. The key, however, was thrown on the desk of said R. Hall McCormick and left there.

"An agreement dated October 4, 1893, was made between the Market National Bank of Chicago, Illinois, and Leander J. McCormick, providing that Leander J. McCormick should take possession of the leased premises and do his best to rent them, without prejudice to the rights of either party on said original lease, except that in case the bank was held liable on said lease the rent received should be applied to reduce such liability. Said agreement is signed by the Market National Bank, by A. F. Seeberger, president, and Leander J. McCormick. Leander J. McCormick made every effort to rent and obtain a tenant for the premises pursuant to the agreement of October 4, 1893, but was unable to rent them or secure a tenant.

"On August 15, 1893, A. F. Seeberger notified Leander J. McCormick of the abandonment of all further proceed-

ings with respect to the carrying on by the said Market National Bank of Chicago of a banking business, and that the Market National Bank would not occupy the premises mentioned in their lease, and that McCormick was at liberty at any time to take possession thereof. From that date down to May 1, 1895, Leander J. McCormick refused to accept a surrender of said lease, and the Market National Bank of Chicago has refused to occupy the demised premises thereunder, or to pay the rent accruing subsequent to July 22, 1893. Said premises therefore remained vacant and unoccupied, and on October 4, 1893, were taken possession of by said McCormick in pursuance of an agreement between the parties.

"On July 15, 1893, the organizers of the Market National Bank of Chicago executed and signed a certificate revoking their articles of association and organization certificate, and transmitted the same to the comptroller of the currency, who filed the same in his office.

"On January 3, 1895, Leander J. McCormick notified A. F. Seeberger, as president of the Market National Bank of Chicago, in writing, that he intended to terminate said lease on May 1, 1895, in accordance with the terms thereof. This suit was brought against the Market National Bank of Chicago, as organized under the articles of association and organization certificate dated January 31, 1893.

"The portions of the United States statutes with reference to the organization of national banks which are in this case particularly material are the following:

"'Sec. 5133. They shall enter into articles of association, which shall specify, in general terms, the object for which the association was formed. These articles shall be signed by the persons uniting to form the association, and a copy of them shall be forwarded to the comptroller of the currency to be filed and preserved in his office.

"'Sec. 5134. The persons uniting to form such an association shall, under their hands, make an organization certificate which shall specifically state: First, the name assumed by such association; second, the place where its operations of discount and deposits are to be carried on; third, the amount of capital stock; fourth, the names and places of residence of the shareholders and the number of shares held by each of them; fifth, the fact that the certificate is made to enable such persons to avail themselves of the advantages of this title.

"'Sec. 5135. The organization certificate shall be acknowledged before a judge of some court of record or notary public, and shall be, together with the acknowledgment thereon, authenticated by the seal of such clerk or notary, transmitted to the comptroller of the currency, who shall record and carefully preserve the same in his office.

"'Sec. 5136. Upon duly making and filing articles of association and organization certificates the association shall become, as from the date of the execution of its organization certificate, a body corporate, and as such, and in the name designated in the organization certificate, it shall have power: First, to adopt and use a corporate seal; second, to have succession; third, to make contracts; fourth, to sue and to be sued, complain and defend, in any court of law or equity, as fully as natural persons; fifth, to elect or appoint directors, and by its board of directors to appoint a president, vice-president, cashier and other officers, define their duties, require bonds of them, and fix the penalty thereof, dismiss such officers, or any of them, at pleasure, and appoint others to fill their places; sixth, to prescribe, by its board of directors, by-laws; seventh, to exercise, by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on its business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange and

other evidences of debt; by receiving deposits; by buying and selling exchange coin and bullion; by loaning money on personal securities; by obtaining, issuing and certifying notes, according to the provision of this title. But no association shall transact any business, except such as is incidental and necessarily preliminary to its organization, until it has been authorized by the comptroller of the currency to commence the business of banking.'

"Section 5168 provides that the comptroller shall issue a certificate to do a banking business after at least fifty per centum of its capital stock has been paid in, and after the necessary government bonds .shall be deposited to secure the issue of its currency.

" 'Sec. 5190. The usual business of each banking association shall be transacted at an office or banking house located in the place specified in its organization certificate.'

"In passing upon this case we are first called upon to determine the effect of the United States statute reading, 'but no association shall transact any business, except such as is incidental and necessarily preliminary to its organization, until it has been authorized by the comptroller of the currency to commence the business of banking.' We do not regard this as meaning incidental and necessarily preliminary to the commencement of a banking business. The words under consideration are in the section with, and immediately following, a statement of powers incidental to the business of banking which the corporation is authorized to exercise. If the intention of Congress had been to merely forbid the doing of any business except such as is 'incidental and necessarily preliminary' to the commencement of a banking business it would have said so. Instead of this, it prohibits the doing of any business save such 'as is incidental and necessarily preliminary to' the organization. The word 'organization' is three times used in section 5136 before its use in the restrictive clause. By the terms of said

section the association, 'upon duly making and filing articles of association and an organization certificate,' becomes not only a body corporate, but has all the powers it is ever to possess, were it not for the inhibition already quoted.

"That a lease of offices to be used 'by said Market National Bank as a banking office, and for no other purpose, from May 1, 1893, to April 30, 1898, for $13,000 per annum, payable $1083.33 on the last day of each and every month during said term,' was not incidental and necessarily preliminary to the organization of said corporation is evident. Never having been authorized by the comptroller to commence the business of banking, this corporation had at no time authority to do any business except such as was 'incidental and necessarily preliminary to its organization.' The leasing of rooms as a banking office, and which it was stipulated were to be used for no other purpose, was not 'necessarily preliminary to its organization.' For the mere purpose of doing a banking business it had no power to rent rooms at all, for the doing of a banking business was not 'necessarily preliminary to its organization.' Its acts in this regard were not a defective use of power or the work of a merely *de facto* corporation, but a transaction which this *de jure* and *de facto* corporation was specially forbidden to engage in. To make this lease it had no power. It is quite likely that for the purpose of perfecting its organization it might have rented a room in which its members could meet and pay in their respective subscriptions; that it could also have purchased books in which to record its proceedings, and hired a clerk to keep the record. These things might have been 'necessarily preliminary to its organization.' The renting of rooms 'as a banking office, and for no other purpose,' could not have been 'necessarily preliminary to its organization.'

"The association is required in its organization to state the place where its operations of discount and de-

posit are to be carried on.  But by this is meant the town or city,—not the room, street or number in such town or city.  This is clear from section 5190, which provides that 'the usual business of each banking association shall be transacted at an office or banking house located in the place specified in its organization certificate.'  It will not be contended that a national bank is compelled to designate an office, street or number, and during the entire term of the existence do business at such locality.

"As before stated, the attempt to make this lease was more than an abuse of power or an improper exercise of judgment,—it was an attempt to do that for which no power existed.  The proceeding was neither within the express or implied scope of its powers.  On the contrary, power to do this thing was directly denied.

"The case at bar is not like that of *Tarbell* v. *Page*, 24 Ill. 46, or *Bushnell* v. *Consolidated Ice Co.* 138 id. 67, in which *de facto* corporations made contracts within the powers of the *de jure* body each held itself out to be.  Neither is this case similar to that of *Chubb* v. *Upton*, 95 U. S. 95, in which one who had subscribed for stock attempted to defend upon the ground that the stock for which he subscribed was part of an increase of capital which the company had, without authority, attempted to make. We are herein called upon to deal, not with irregularities, but with a plain attempt to do what was absolutely forbidden, and we are asked to enforce an executory contract made in defiance of the law, the same as if it had been fully authorized.

"Nor is the company, because it represented itself as fully authorized to make this lease, now estopped from insisting upon its want of power.  On the contrary, it is its duty to cease to act in defiance of the law, and it has no right, by silence, to suffer itself to be driven into a continuance of what was always wrong.  To enforce the part of this agreement which yet remains executory

would be for the court to declare that a corporation can, by a contemptuous disregard of the law, acquire powers forbidden to it, or, as is said in *Cincinnati Mutual Health Ass. Co.* v. *Rosenthal,* 55 Ill. 85-87, 'to give the person or corporation or individual the same rights in enforcing prohibited contracts as the good citizen who respects and conforms to the law.'

"It is well settled that while corporations cannot be rendered directly liable upon *ultra vires* transactions, they must account for benefits received therefrom. (Green's Brice on Ultra Vires, 42, 728.) Where benefits have been received under an *ultra vires* agreement, relief granted is not upon the basis that a valid or merely voidable contract has been entered into, but, the act not being *malum in se,* the parties will, as near as they well can, be restored to their original condition. *Pennsylvania Railroad Co.* v. *St. Louis, Alton, etc. Railroad Co.* 118 U. S. 290; *Thomas* v. *Railroad Co.* 101 id. 71; *Oregon Railway and Navigation Co.* v. *Oregonian Railway Co.* 130 id. 1; *Chicago Building Society* v. *Crowell,* 65 Ill. 453, 458.

"We have discussed the question submitted upon the lines presented by appellant, who, the contract having been partially executed, recovered judgment for $2548.53. It is not here contended, nor does it appear, that this was not equal to the entire benefit received by appellee.

"The judgment of the Superior Court is affirmed."

Our consideration of this case has led to the same conclusion reached by the Appellate Court announced in the foregoing opinion by Mr. Justice Waterman. That opinion will accordingly be adopted as the opinion of this court, and the judgment affirmed.

*Judgment affirmed.*

Mr. Justice Carter: I do not concur in the decision rendered in this case.