# Wytheville.

## Richmond, Fredericksburg and Potomac Railroad Company v. Richmond, Fredericksburg and Potomac and Richmond and Petersburg Railroad Connection Company.

### June 17, 1926.

1. Public Service Corporation—*Railroads—Ultra Vires—Sale and Lease of Property and Franchise.*—Neither a railroad nor any other public service corporation can lawfully sell or lease its property and franchise to another public service corporation, in the absence of affirmative legislative authority.

2. Railroad—*Ultra Vires—Connection Railroad—Code of 1860, Chapters 56, 57, 61—Case at Bar.*—In the instant case, complainant, a short connecting line between two railroads, leased its entire line to one of these railroads, the defendant. Defendant contended that the lease was *ultra vires* and complainant contended that under chapters 56, 57 and 61 of the Code of 1860 it was authorized to make the lease.

   *Held:* That the connection company under these provisions was not authorized to lease its entire road and its franchise.

3. Railroads—*Sale or Lease of Property and Franchise—Chapters 56, 57, and 61 of the Code of 1860.*—Chapters 56, 57 and 61 of the Code of 1860 authorized transactions in the ordinary course of business and do not extend to the sale or lease of an entire railroad and its franchises.

4. Railroads—*Sale or Lease of Property and Franchises—General Power to Sell, Contract and Dispose of.*—Generally a power conferred upon a railroad to sell and dispose has reference only to transactions in the ordinary course of business, incident to a railroad company, and does not extend to the sale of the railroad itself or the franchises connected therewith.

5. Railroads—*Sale of Franchises and Property—Chapter 61 of the Code of 1860—Contractors Held not to Mean Lessees.*—Section 17 of Chap. 61 of the Code of 1860 confers no authority upon a railroad company to sell or lease its property and franchise. It confers authority upon the railroad itself to transport persons and property by its officers and agents, or by contractors. "Contractors," as used here, does not mean lessees.

6. RAILROADS—*Sale or Lease of Property—Implied Power to Lease—Short Connecting Line Between Two Railroads Leased to One of the Railroads—Case at Bar.*—In the instant case, a short connecting line in a city between two railroads was leased to one of the railroads, it was contended that the connection road had implied power to make the lease because the title of the act showed the road was to be a connection road between two existing roads, because the length of the road, one and one-half miles located entirely within a city, indicated that it was not to be operated as an independent road and because the connection road's charter was sufficiently broad and comprehensive to include power to make a lease of the entire works and franchises of the connection road, since the transportation of passengers, etc., might be arranged for "upon such terms as may be agreed between" the connection road and the roads connected.

   *Held:* That an implied power to lease the connection road and franchise could not be inferred from these circumstances.

7. CORPORATIONS—*Charter—Construction.*—The construction of the charter depends primarily, of course, upon the intention of the legislature which granted it, as expressed by the language used, or as implied fairly therefrom, as incidental to the objects for which the corporation was created.

8. RAILROADS—*Charter—Power to Lease—Intention Doubtful.*—The charter of a railroad must be read as a whole, and if, after so reading, the intention remains doubtful, an authority to lease must be considered never to have been granted.

9. GRANTS—*Construction—Ambiguity.*—Every public grant of property, or of privileges or franchises, if ambiguous, is to be construed against the grantee and in favor of the public; because an intention on the part of the government to grant to private persons, or to a particular corporation, property or rights in which the whole public is interested, cannot be presumed, unless unequivocally expressed or necessarily to be implied in the terms of the grant.

10. RAILROADS—*Power to Lease—Title of Act Incorporating the Railroad—Case at Bar.*—In the instant case, the power of a railroad to lease its whole property and franchise to another railroad was sought to be implied from the title of the act incorporating it, which indicated that it was a connection line between two other railroads. While this contention gathered some little force in this particular case, when considered in connection with the charter, the title of the act had no significance worthy of consideration so far as conferring authority to lease was concerned.

11. RAILROADS—*Power to Lease—Connection Road Between Two other Railroads—Case at Bar.*—The question at issue, in the instant case, was whether a connection railroad had the power to lease its road and franchises to one of the two railroads which it connected. The

railroads connected were vitally interested in securing the construction of a connection road. They encouraged subscriptions to stock of the connection company, and they had the power to locate the termini of the new road and the character of the road and its location. No express power to lease the connection road to either of the railroads which it connected was granted, though power to sell was.

*Held:* That the power to lease the connection road was not incidental to the objects for which the corporation was created and could not be implied.

12. Railroads—*Road Connecting Two other Railroads—Power to Lease—Power to Operate—Case at Bar.*—In the instant case, where the question at issue was whether a short connection road between two other railroads had power to lease its franchise and property to one of the roads which it connected, it was contended that it must have such power because under its charter there was no express authority to operate. As between the inference that it was intended that the connection company. should operate the road, and the inference that it had the power to lease its entire works and franchises, the inference would be in favor of the operation by the connection company, because operation of a railroad by a company authorized by charter to make it or build it, is one of the incidents or incidental powers of the authority to construct and would be presumed, while the power to lease is not.

13. Railroads—*Power to Lease—Short Railroad Connecting Two others— Power to Operate Inferred from Power to Charge Tolls—Case at Bar.*— The charter of a short railroad connecting two other railroads provided that the connection company and that company alone might charge a certain toll for each passenger over the road.

*Held:* That this provision clearly contemplated an operation of the road by.the connection company because in the event of a sale, the purchasing company was expressly forbidden to charge this toll.

14. Railroads—*Power to Lease—Power· to Operate a Short Connection Line—Inference from Length of Line—Case at Bar.*—In the instant case, it was contended that, from the length (one and one-half miles) of a line connecting two railroads, that it could not have been the intention of the legislature that it should be operated independently and that, therefore, it had the power to lease its property and franchises to one of the roads which it connected. But in view of the fact that it was to carry all the through passengers and freight of the roads it connected and the high toll which it was allowed to charge, the connection road's success as a financial proposition was assured and the short length of the road raised no doubt that it was intended to be operated independently.

15. Railroads—*Power to Lease—Connection Line Between Two Railroads—*

*Traffic Arrangements Between the Connection Line and the Railroads Connected—Case at Bar.*—A clause in the charter of a railroad connecting two other roads declared that it should be lawful, by agreement between the company chartered by the act and the roads to be connected, to transport passengers, goods, etc., over the connection road "upon such terms as may be agreed between them." This language certainly does not afford as strong an implication that the company should lease its road for this purpose as that it should retain possession and control of its road and make traffic agreements with the roads connected. Indeed this clause confers the express authority to do this very thing, and it cannot properly be construed to confer a greater power than this, namely, to turn over its whole works and franchises to these two companies or either of them.

16. GRANTS—*Construction—Against Grantee.*—A grant is supposed to be made at the solicitation of the grantee, and to be drawn up by him or by his agents, and therefore the words used are to be treated as those of the grantee; and this rule of construction is a wholesome safeguard of the interests of the public against any attempt of the grantee, by the insertion of ambiguous language, to take what could not be obtained in clear and express terms.

17. RAILROADS—*Power to Lease—Power to Lease not Inferred from Power to Sell—Case at Bar.*—In the instant case, the charter of a short line connecting two other railroads provided that the connection road might sell its road and franchises to either of the roads which it connected not less than ten and not more than twenty years after its completion.

*Held:* That a right to lease if implied from this power to sell would begin when the right of purchase began and end when it ended, a right to purchase between 1877 and 1887 would not constitute a right to lease in 1866.

18. RAILROADS—*Lease—Power to Lease Inferred from Power to Sell—Case at Bar.*—In the instant case, the charter of a short railroad connecting two other railroads provided that, within a certain time, the short road might sell its road and franchises to either of the roads it connected. But also provided that in case of sale to either of the roads connected, that road could not charge the high tolls the connection road was authorized to charge, but only the tolls it was authorized to charge on other portions of its railroad.

*Held:* That if the right to charge the tolls fixed for the connection railroad could not pass by purchase, it could not pass by lease, and a lease attempting to transfer it was void.

19. INTERPRETATION AND CONSTRUCTION—*Practical Construction—No Ambiguity.*—No construction of the parties can change the import of language which is plain and unambiguous.

20. CORPORATIONS—*Charter—Public Service Corporations—Practical Construction of Charter by Grantee.*—A charter is a grant from the State

to a public service corporation and no practical construction of the charter by the grantee and others, not acquiesced in by the State, can determine the construction to be given the charter.

21. CORPORATIONS—*Ultra Vires—Void or Voidable—Ratification.*—A contract of a corporation which is *ultra vires* in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either.

22. CORPORATIONS—*Ultra Vires—Executed Contract—Estoppel.*—When the contract is once declared *ultra vires,* the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suit or action, nor does the doctrine of estoppel apply.

23. RAILROADS—*Lease—Charter Construed in Favor of State—Short Railroad Connecting Two others—Interest of the Roads Connected—Case at Bar.*—In the instant case, the question at issue was the power of a short connection railroad to lease its road to one of the railroads it connected. The railroads connected were the prime movers in getting up the connection road and all the circumstances pointed to the connection road as really belonging to them, that it was their creation and that the three roads could do practically as they pleased—sell, lease or make traffic arrangements.

*Held:* That notwithstanding this, as no express or implied statutory power to lease the connection road could be shown, the corporation had no such power. The charter must be construed in favor of the State and against the corporation. Indeed, all doubts are to be resolved against the grant of a power not expressly given.

24. RAILROADS—*Lease—Situation of the Parties—Case at Bar.*—Where the question at issue was the power of a short railroad, connecting two other railroads, to lease its franchises and road to one of the railroads connected, the omission from the charter of the express authority, and the absence of any expression which could fairly be interpreted as given implied authority to lease, must outweigh any impression obtained from the situation of the parties and surrounding circumstances as to what ought to have been done. The legislature, at the instance of the parties, finally put their desires and intentions into a written memorial. Under the rules of construction, that memorial must speak for itself.

25. PUBLIC SERVICE CORPORATION—*Charter—Construction—Construction of Charter and Ordinary Contract Distinguished.*—In interpreting a contract more or less ambiguous between the parties, the situation of the parties, the circumstances surrounding them and their subsequent conduct with reference to it, are exceedingly helpful, but

these things afford little or no help in determining the powers conferred by the legislature in a charter upon a public service corporation.

26. CONTRACTS—*Void Contracts.*—No action for damages can rightly be founded on a void contract and no void contract can become lawful or valid by being carried into execution.

27. RAILROADS—*Lease—Void Lease—Recovery of Rent—Quantum Meruit.*— Under a void railroad lease there can be no recovery for rent due under the contract as far as it was executed, but the lessee having actually received the benefit of the use of the property leased, the lessor can recover upon a *quantum meruit* up to the time of the abandonment of the contract.

28. ASSUMPSIT—*Void Contracts—Recovery Under Quantum Meruit—Institution of Proceedings.*—Where an action is founded upon a contract which is shown to be void, but the contract has been executed and the defendant has enjoyed valuable rights thereunder, a recovery upon a *quantum meruit* under the general issue should be permitted in the original action without requiring the institution of entirely new proceedings, if the pleadings are sufficiently broad and the proof is sufficient.

29. RAILROADS—*Lease—Void Lease—Damages Under Quantum Meruit.*— Where a railroad lease was void as *ultra vires,* the amount of damages to which the lessor is entitled for the use and occupancy of the property under the void lease by the lessee, is that fixed by the parties themselves in their attempted lease.

30. RAILROADS—*Lease—Agreement as to Division of Tolls Between the Parties to the Lease.*—After an order of the State Corporation Commission prohibiting the lessee of a railroad from charging certain tolls, there was an adjustment made between the lessor and the lessee and the rent was paid under this adjustment without complaint for seventeen years. In an action by the lessor against the lessee, the lessee claimed, by way of set-off, rent paid under this adjustment.

*Held:* That, treating the lease as legal, the plea of set-off came too late after the parties had agreed to a new division of tolls, as they existed after the order of the State Corporation Commission and upon a *quantum meruit,* the claim of set-off should also be disallowed.

Error to a judgment of the Circuit Court of the city of Richmond, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Reversed in part; affirmed in part.*

The opinion states the case.

*Eppa Hunton, Jr.,* and *Jno. S. Eggleston,* for the plaintiff in error.

*Leake & Buford, Scott & Buchanan, Meredith & Meredith* and *Thomas L. Preston,* for the defendant in error.

CHICHESTER, J., delivered the opinion of the court.

The Richmond, Fredericksburg and Potomac Railroad Company (hereafter referred to as the R. F. & P.) is here complaining of a judgment for $455,438.55, with interest, as later herein set out, against it in favor of the Richmond, Fredericksburg and Potomac and Richmond and Petersburg Connection Company (hereafter referred to as the Connection Company), rendered on July 31, 1925, in the Circuit Court of the city of Richmond.

The R. F. & P. was organized under a charter granted by the General Assembly of Virginia by act approved February 25, 1834 (Acts 1833-4, pp. 127, 129). The Richmond and Petersburg Railroad (hereafter referred to as the R. & P.) was organized under a charter granted by the General Assembly of Virginia by an act approved March 14, 1836 (Acts 1835-36, p. 146).

Under its charter, the R. F. & P. built a railroad from the city of Richmond, at 8th and Broad streets, northward to Fredericksburg, and later beyond this point.

The R. & P., under its charter, built a railroad from a point on the north bank of the James river, at Byrd street, in Richmond, Va., south to Petersburg, Va.

Thus, at the close of the Civil War, the southern terminus of the R. F. & P. at 8th and Broad streets was separated from the northern terminus of the R. & P. at Byrd street by a distance of one and one-quarter miles. There was no railroad between the termini of these two railroads, and through traffic over the two roads was therefore impossible.

In order to bridge the intervening space, capital was interested by the two railroads in the organization of a company to build a connecting railroad, and on March 3, 1866 (Acts 1865-6, c. 204), the General Assembly granted a charter to the Connection Company. The charter provided, among other things, that there should be formed a joint stock company for the purpose of—

"Making a railroad from some point at, or near, the southern terminus of the Richmond, Fredericksburg and Potomac Railroad to a point at, or near, the northern terminus of the Richmond and Petersburg Railroad, so as to form connection by railroad between the said termini respectively; provided, however, that the points of termini and the location and character of the said connecting road shall be determined by the president and directors of the R. F. & P. R. R. Co., and of the R. & P. R. Co., as to the connecting road between their roads."

Section 4 of the charter provided that it should be lawful, for transporting passengers over said connection road, to charge a toll of not more than fifty (50) cents for each passenger, and for transporting goods over the same an average rate of not more than five (5) cents per mile for each one hundred pounds, provided that whenever the net profits "accruing from transportation over said connection" should be such that dividends might be declared out of such profits

exceeding fifteen per centum on the capital stock invested, after the payment of all necessary expenses and setting apart a fair and reasonable sum for repairs, "then the said rates of toll shall be reduced accordingly."

By section 5 of the charter it was further provided that it should be lawful by agreement between the Connection Company and the other companies mentioned, or either of them, to transport passengers and goods "over the railroad connecting the termini of said last mentioned roads as aforesaid (R. F. & P. and the R. & P. companies) upon such terms as may be agreed between them;" that the other two companies mentioned, or either of them, should have the right at any time, not less than ten and not more than twenty years after the completion of said connecting railroad, to purchase "the said road connecting their two railroads from the company chartered by this act, paying for the same a fair valuation to be ascertained by three commissioners" to be chosen in the manner therein prescribed. And it was further declared that, upon the making of such purchase, "all the right, title, estate and franchises of the company chartered by this act shall cease and determine and the same shall belong to and vest in" the purchasing company, and the purchasing company shall "succeed to and enjoy the right to transport passengers and goods over the road of the Connection Company and of charging tolls therefor in the same manner as the purchaser might charge tolls on other portions of its road."

Consent of the council of the city of Richmond was then secured for the construction and operation of the proposed connecting railroad within the corporate limits and along the streets of the city between the

points mentioned. To this end the· city council, on April 30, 1866, passed an ordinance which provided, among other things: That the Connection Company, by the act passed March 3, · 1866, should have the authority and the right "to construct a railroad through the corporate limits of this city, by the route and in accordance with the plan submitted to the council," and "by its officers and agents, or by the agency of the connected railroads, should have the authority and the right" to transport over said .proposed connecting railroad in cars drawn by locomotive engines, passengers and freight in accordance with their charter, and the laws of Virginia, and with the ordinances of this city," subject, however, to "such future regulations" as might be thereafter adopted by the council for the protection of persons and property along the projected route.

After the granting of the charter to the Connection Company, and about a year prior to the completion of the road, the directors of the R. F. & P. passed two resolutions engaging it to lease the connection road when completed. The first resolution was passed May 23, 1866. The second resolution, adopted on June 18, 1866, after reciting that it was represented to the directorate of said company that there are parties who may be induced to subscribe liberally to the construction of the proposed railroad by some further assurance that the Richmond, Fredericksburg and Potomac Railroad Company would lease said connecting railroad upon the terms recited in the previous resolution "for a term of not less than ten (10) years," and that neither the Richmond, Fredericksburg and Potomac Railroad Company nor the Richmond and Petersburg Railroad Company would oppose the exercise of a right of appeal to the civil courts from an

award of the commissioners mentioned in the fifth section of the charter, resolved that the R. F. & P. Company would be willing to lease the road accordingly and would not oppose the exercise of said right of appeal.

Sufficient subscriptions of stock were secured, and the connection road was completed and opened for business on the 20th day of April, 1867. We state this as the date of the completion of the road because it was found to be the date of completion by the trial court upon a conflict of evidence on this point.

The instrument by which the R. F. & P. acquired control of the connection road was under seal and was dated August 1, 1866. The R. F. & P. was designated as party of the first part, the R. & P. was designated as party of the second part, and the Connection Company party of the third part. Omitting the formal parts, and such parts as are not pertinent here, the contract provided:

That under the fifth and other sections of the last mentioned act, the company of the third part, so far as it is empowered to do so, has agreed to demise, and doth hereby demise unto the company of the first part all the railroad and works constructed, or to be constructed, under the said act; also all the right, title and franchise of the said company of the third part, to demand, collect and recover the tolls and fares authorized by the said act, passed the third day of March, 1866, for the following term, to wit: (For ten years from and after the completion of said railroad, and thenceforth until, by a purchase duly perfected, according to the fifth section of said act and this deed, all the right, title, estate and franchises of the company of the third part in and to the property so purchased shall cease and determine); and the

company of the third part covenants for the quiet enjoyment by the company of the first part of their term.

The R. F. & P. further covenanted that during the whole of the term of lease at its own cost to keep the connection railroad in good repair and condition, and operate it; and, with its locomotives, etc., "upon the payment or tender of the lawful rates of toll, properly transport over said railroad and duly deliver all passengers, goods, produce, merchandise, and other articles that ought to be so transported and delivered." It was agreed that the R. F. & P. was to take all the tolls but was to pay, by way of rent, to the Connection Company "twenty-five cents for each passenger transported over said railroad during said term, and one-half of the gross receipts for the transportation of all freight carried over it during the said term;" and to pay the taxes as well as to pay the rent. And it was then covenanted that, inasmuch as there was some risk that the tolls from freight and passengers provided for may not produce enough revenue to pay the stockholders as much as eight per cent. on their subscription of stock, the R. F. & P. and the R. & P. agreed to pay the Connection Company, regardless of what revenue the tolls produced, such an amount each year as would produce to those stockholders a net revenue, exclusive of public taxes, equal to eight per centum per annum on the subscriptions.

Afterwards, on April 9, 1867, there was a supplementary agreement as to the transportation of local passengers and local freight over the connection road.

Upon completion of the connection road it was taken possession of by the R. F. & P. and operated continuously by that road until the 31st day of December, 1917, the through mail, passengers and freight trains

being operated thereon, except that after the construction of a belt line around the city of Richmond, the freight trains were routed over the belt line. During all that period up until October 20, 1917, the Connection Company was paid its proportion of the fares collected and for such mail and freight as was transported over its road as provided for in the contracts. (The agreement of August 1, 1866, and of April 9, 1867, together, will hereafter be referred to as *the lease.*)

On February 18, 1916, the common council and the board of aldermen of the city of Richmond passed an ordinance, in which it was declared that the grade crossings of the R. F. & P., R. & P. and the Connection Company at Cary, Main, Franklin, Grace, etc., streets, embarrassed traffic and endangered life, and required that these companies reconstruct and rearrange their tracks so as to avoid the use of these streets at grade.

The Connection Company denied the validity of this ordinance and its president addressed a communication to the R. F. & P. in which it declared in substance: That the R. F. & P. held and operated the property of the Connection Company under a perpetual lease dated August 1, 1866; that the said resolution of the council of the city of Richmond was void; that the said city council had no power to require that the connection tracks should be reconstructed so as to be either above or below the grades of the streets mentioned; that any reconstruction which the city may have had the power to require, and may have required, must be executed by the R. F. & P. at its costs and charges; and that the Connection Company refused to recognize the right of the R. F. & P. to allow said resolution to interfere in any way or to any extent with its obligations under said lease; that it

was the purpose of the Connection Company to hold the R. F. & P. bound for the continued performance of the terms of said lease.

The R. F. & P. did not reply to this communication, but continued to operate the Connection Company road, paying the stipulated amount provided for in the agreement until October 20, 1917. A copy of this communication was sent to the Atlantic Coast Line Railroad Company, successor to the R. & P., the other party to the agreement of August 1, 1866.

On December 31, 1917, the entire property of the R. F. & P. was taken possession of by Federal authorities, pursuant to acts of Congress and proclamation of the President thereunder, and the Connection Company track was used by the Government for transportation of the United States mails, passengers and express. This use by the United States Government continued until January 6, 1919.

In the meantime the R. F. & P. and other railroads had built and completed Broad Street station, and had constructed a double track railroad therefrom, along the line of the old belt line to the James river, where it made connection with the South.

On January 23, 1919, the R. F. & P. and the Atlantic Coast Line Railroad Company, the latter successor to the Richmond and Petersburg Railroad, gave the Connection Company notice of their intention . to terminate the agreement of lease, dated August 1, 1866, and the supplementary agreement of April 9, 1867, on the 1st day of May, 1919. Thereupon the Connection Company brought this action by notice of motion for judgment.

There are three separate and distinct sums sued for:

1st, To amount of rent alleged to be due according to the terms of the contract of lease and supplemental agreement, from March 1, 1917, to January 6, 1919 _____$ 100,646 07

| | | | |
|---|---|---|---|
| 2nd. | Rent accruing under the lease and supplemental agreement between January 6, 1919, and May 1, 1919_____$ | 40,000 | 00 |
| 3rd. | Damages for renunciation of lease and supplementary agreement_____ | 750,000 | 00 |
| | Total_____$ | 924,793 | 54 |

With legal interest on $2,959.25 from October 20, 1917, on $3,694.80 from April 20, 1918, on $27,493.42 (being $3,110.70 plus $24,382.72) from October 20, 1918, on $100,646.07 from April 20, 1919, and on $790,-000.00, the residue, from May 1, 1919, until paid.

These items claimed, were based upon the contention that the Connection Company and the R. F. & P. had a right under statute law in force at the time of the granting of the charter and under the charter of the former road to enter into the contract of lease, and that the lease was therefore valid and binding; that in its inception the lease was of indefinite duration, terminable only in the manner prescribed, that is, by purchase by the R. F. & P. or the R. & P., either or both of them, in the time prescribed by section 5 of the charter, and not having been terminated in the manner therein prescribed it became, after twenty years from the date of the completion of the connection road, and was afterwards, and on May 1, 1919, a lease in perpetuity.

The trial court took the view that the lease was valid; that it was before and on the 1st of May, 1919, a perpetual lease; that the R. F. & P. had breached its contract without just cause; and that the damage suffered by the Connection Company by reason of the breach was—

(1) Rent admitted as having accrued and remained unpaid prior to January 6, 1919_____$ 134,793 54 with interest on the several instalments making up said sum as claimed in the notice, to wit: On $2,959.25, part thereof from October 20, 1917; on $3,694.80, another part thereof, from

April 20, 1918; on $27,493.42, another part thereof, from October 20, 1918; on $100,646.07, the residue thereof from April 20, 1919, until paid;

    (2) The amount which should have been paid as rent under the lease between January 6, 1919, and May 1, 1919_____    36,645 01
with interest thereon from May 1, 1919; and

    (3) Damages for the renunciation of agreement of lease of August 1, 1866_____    284,000 00
with interest thereon from May 1, 1919.

Judgment was entered accordingly.

There were a number of defenses to the action, but, as indicted by the judgment of the trial court, the case was fought out on the three main questions:

1st: It was contended by the R. F. & P. that "the alleged lease, dated August 1, 1866, and the alleged supplementary agreement, dated April 9, 1867, in the said plaintiff's amended notice of motion set forth as the basis of its supposed cause of action, are, and each of them is and always has been, null and void in law, for lack of authority and corporate power on the part of the parties thereto to make and enter into the same; and each of them was and is in excess and in violation of the corporate powers of the said plaintiff, and of the purposes of its incorporation;"

2nd: It was contended that, if the lease was valid, after twenty years from the completion of the Connection Company's road, it became a lease from year to year, and not a perpetual lease, as contended for by the Connection Company;

3rd: It was contended that, if the lease was valid and perpetual, the ordinance of the city of Richmond requiring the abolition of grade crossings was a valid exercise of the police power; that it was the duty of the Connection Company to reconstruct their road, and having failed to do it, the R. F. & P. was absolved from further compliance with the contract or lease.

There were a number of other defenses interposed, but in the view we take of the case it will not be necessary to discuss any of them, except the first, unless, as it sometimes will occur, some of them may be connected incidentally with the question of the validity of the lease or the question of damages. Indeed, there are seventeen assignments of error and the argument of the case took as wide a range as the importance of the case and the multiplicity of issues warranted, but we do not propose to open Pandora's box any further than is necessary to decide the case on its merits.

There were some minor contests as to procedure, but they do not affect the real merits of the case, and unless they are involved in the real questions raised, will not be discussed, as there was at least no prejudicial error as to them.

The question involved in the defense designated as No. 1 was raised by the first ground of demurrer to the notice of motion and plea No. 2, and involves, as stated, the validity of the lease.

[1] We think it is well settled in this country that in the absence of affirmative legislative authority, neither a railroad nor any other public service corporation can lawfully sell or lease its property and franchise to another public service corporation. Of course, the contention here is that the affirmative legislative authority is not lacking. The principle is not disputed, but a few quotations from leading cases will make the scope and extent of the principle clear.

Thus, in *Thomas* v. *Railroad*, 101 U. S. 82 (25 L. Ed. 950), it is said: "We take the general doctrine to be in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of corporations organized under legislative statutes are such, and such only, as those statutes

confer.   Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of these powers implies the exclusion of all others."

Again, in *Green Bay, etc., R. R. Co.* v. *Union, etc., Co.,* 107 U. S. 100, 2 S. Ct. 223 (27 L. Ed. 413), it is said:   "The general doctrine upon this subject is now well settled.   The charter of a corporation, read in connection with the general laws applicable to it, is the measure of its powers, and a contract manifestly beyond these powers will not sustain an action against the corporation.   But whatever, under the charter and other general laws, reasonably construed, may fairly be regarded as incidental to the objects for which the corporation is created, is not to be taken as prohibited."

And again, in *Penn. Co.* v. *St. Louis, etc., R.,* 118 U. S. 290, 6 S. Ct. 1094, 30 L. Ed. 83:   "We think it may be stated, as the just result of these cases and on sound principle, that unless specially authorized by its charter, or aided by some other legislative action, a railroad company cannot, by lease, or any other contract, turn over to another company, for a long period of time, its road and all its appurtenances, the use of its franchises, and the exercise of its powers, nor can any other railroad company, without similar authority, make a contract to receive and operate such road, franchises and property of the first corporation, and that such a contract is not among the ordinary powers of a railroad company, and is not to be presumed from the usual grant of powers in a railroad charter."

We must, therefore, look to the charter of the Con-

nection Company and to the general laws in force at the time of the granting of the charter, and measure them by these clear cut principles to ascertain whether the company had the power to make the lease.

The Connection Company contends that it and the R. F. & P. had express statutory authority to make the lease, or at least the authority to make the lease is clearly implied by the terms of the charter of the Connection Company.

[2-4] The claim as to express authority is based upon the general statute law, as contained in the Code of 1860. Section 2 of the Connection Company's charter provides that the company shall be "subject to the provisions and entitled to the benefits, so far as the same are applicable, of chapters 56, 57 and 61 of the Code of Virginia."

Chapter 56, section 1, Code of 1860, provides: "Every corporation in respect to which it is not otherwise provided shall have perpetual succession and * * * may contract and be contracted with, purchase, hold and grant estates real and personal."

In chapter 61, Code of 1860, we find this: "So soon as any portion of a railroad may be ready for transportation the railroad company may, by its officers and agents, or by contractors, transport persons and property on the same."

From these general statutes it is deduced that in 1866 it was not only the policy of the State of Virginia to permit its railroads to be operated by contractors with the owners thereof, but that the parties to the contract and lease of August 1, 1866, were given express authority and the fullest and most ample powers of contracting with each other with respect to the railroad authorized to be built under the charter of the Connection Company, and each had the fullest

power of granting and holding estates, real and personal.

It is perfectly apparent to us that the sections of the Code of 1860, referred to, did not give the Connection Company authority to lease its entire road and its franchises. These statutes authorize transactions in the ordinary course of business and do not extend to either the sale or the lease of an entire railroad and its franchise. The authorities construing similar statutory expressions are unanimous in holding this. See *Penn. R. R.* v. *St. Louis, etc., R. R.*, 118 U. S. 290, 6 S. Ct. 1094, 30 L. Ed. 83; *Central Trans. Co.* v. *Pullman's Car Co.,* 139 U. S. 24, 11 S. Ct. 478, 35 L. Ed. 55; *Branch* v. *Jessup*, 106 U. S. 478, 1 S. Ct. 495, 27 L. Ed. 279; *Oregon Ry.* v. *Oregonian Ry.*, 130 U. S. 1, 9 S. Ct. 409, 32 L. Ed. 827.

An examination of these authorities disposes of plaintiff's contention and dispels every doubt upon the question of either express or implied authority to lease, so far as these general statutes are concerned. Nor do these statutes indicate State policy in conflict with the principles heretofore quoted. Thus, in *Central Trans. Co.* v. *Pullman's Car Co., supra,* at p. 44 (11 S. Ct. 482), it is said: "Generally the power to sell and dispose has reference only to transactions in the ordinary course of business incident to a railroad company, and does not extend to the sale of the railroad itself, or of the franchises connected therewith. Outlying lands, not needed for railroad purposes, may be sold. Machinery and other personal property may be sold. But the road and franchises are generally inalienable; and they are so, not only because they are acquired by legislative grant, or in the exercise of special authority given for the specific purposes of the incorporating act, but because they are essential to the fulfilment of these purposes, and it would be a

dereliction of the duty owed by the corporation to the State and to the public to part with them."

[5] Section 17 of chapter 61 of the Code of 1860, confers no authority upon a railroad company to sell or lease its property and franchise. It confers authority upon the railroad itself to transport persons and property by its officers and agents or by contractors. Contractors, as used here, does not mean lessees.

There was nothing in the general statute law, at the time of the granting, of the charter to the Connection Company, which expressly gave it power to lease its property and franchise, and there is nothing from which such power can be implied.

[6] But it is contended that if there is no express authority it is clearly implied by the terms of the charter.

The argument as to implied power to lease is based upon the following facts: 1st: The title of the act shows the road was to be a connecting road between two existing roads; 2nd: The length of the road, one and one-quarter miles, located entirely within the city, indicates that it was not to be operated as an independent road; 3rd: Under section 5 of the Connection Company's charter, the contention is that the language, "that it shall be lawful, by agreement between the company chartered by this act and the said Richmond, Fredericksburg and Potomac Railroad Company and the Richmond and Petersburg Railroad Company, or either of the said companies, to transport passengers, goods, produce, merchandise and other articles over the railroad connecting the termini of said last mentioned roads as aforesaid, upon such terms as may be agreed between them," is sufficiently broad and comprehensive to include power to make a lease of the entire works and franchises of the con-

nection road, since the transportation of passengers, etc., may be arranged for "upon such terms as may be agreed between them;" and, 4th: It is claimed that the express power to *purchase* the connection road is conferred by section 5 of the charter upon the R. F. & P. and the R. & P., or either of them, and the power to sell is thus necessarily conferred upon the Connection Company, and that it follows that the lesser power (that is, the power to lease), is impliedly conferred.

Before taking up in order the various grounds upon which the contention that implied power to lease was granted by the charter, it is well to advert here to the general principles evolved from decided cases which control, or assist, at least, in the construction of the charter here being considered.

[7, 8] The construction of the charter depends primarily, of course, upon the intention of the legislature which granted it, as expressed by the language used, or as implied fairly therefrom, as incidental to the objects for which the corporation was created. The charter must be read as a whole, and if, after the reading, the intention remains doubtful, the authority to lease must be considered never to have been granted.

[9] As was said in *Central Transp. Co.* v. *Pullman's Car Co.*, 139 U. S. at p. 49, 11 S. Ct. 484 (35 L. Ed. 55): "By a familiar rule, every public grant of property or of privileges or franchises, if ambiguous, is to be construed against the grantee and in favor of the public; because an intention on the part of the government to grant to private persons, or to a particular corporation, property or rights in which the whole public is interested, cannot be presumed, unless unequivocally expressed or necessarily to be implied in the terms of the grant."

In *Black* v. *Delaware & Raritan Canal Co.*, 24 N. J. Eq., at p. 476, it is said: "To be in doubt, in the language of the books, is to be resolved, and I cannot, without disregarding all authority and making new law for the case, hold that power is given to execute the lease in question."

"One of the most important powers with which a corporation can be invested is the right to sell out its whole property, together with the franchises under which it is operated, or the authority to lease its property for a long term of years. In the case of a railroad company these privileges, next to the right to build and operate its railroad, would be. the most important. which could be given it, and this idea would impress. itself upon the legislature. Naturally, we would look for the authority to do these things in some express provision of law. We would suppose that if the legislature saw fit to confer such rights, it would do so in terms which could not be misunderstood." *Oregon Ry. Co.* v. *Oregonian Ry. Co.*, 130 U. S. 30, 9 S. Ct. 415 (32 L. Ed. 837).

Construing the charter of the Connection Company with these principles in view, and construing it strictly against the grantee, is the company, by implication, given the power to enter into this lease or contract?

[10] 1. The title to the act, "an act incorporating the Richmond, Fredericksburg and Potomac and the Richmond and Petersburg Railroad Connection Company," hardly conveys a suggestion of authority to lease the road chartered by the act. It gathers some little force in this particular case when considered in connection with the charter, but so far as the title is. concerned it has no significance worthy of consideration so far as conferring authority to lease is concerned.

In *Board, etc.* v. *The Lafayette, etc., Railroad,* 50

Ind. 110, the court said: "But it is urged by the appraisers that there is authority of law for making the contract in question, if not in express terms yet by fair implication, whether it be called a lease or a sale, and they cite the act of February 23, 1853 (1 G. & H. 526). That act is 'to authorize railroad companies to consolidate their stock with the stock of railroad companies in this or an adjoining State and to connect their roads with the roads of said companies,' etc. The title nowhere mentions a lease or a sale. Indeed, the words 'to connect their roads with the roads of said companies' would seem to exclude such a conclusion. To connect one road with another does not fairly mean to lease it or to sell it to another." *Penn Co.* v. *St. Louis, etc., Railroad,* 118 U. S. at p. 312, 6 S. Ct. 1094, 30 L. Ed. 83; *Louisville & Nashville R. R.* v. *Kentucky,* 161 U. S. 677, 16 S. Ct. 714, 40 L. Ed. 849. See also authorities cited at p. 684 (16 S. Ct. 714), *Idem.*

It is proper, however, to consider the title in connection with the first section of the charter. After making provision for the forming of a joint stock company, this section proceeds: "For the purpose of making a railroad from some point at, or near, the southern terminus of the Richmond, Fredericksburg and Potomac Railroad to a point at, or near, the northern terminus of the Richmond and Petersburg Railroad, so as to form connection by railroad between the said termini, respectively; provided, however, that the points of termini and the location and character of the said connecting roads shall be determined by the president and directors of the Richmond, Fredericksburg and Potomac Railroad Company, and of the Richmond and Petersburg Railroad Company, as to the connecting road between their roads."

It is contended that the charter contemplates the *construction* of the connection road by the company organized thereunder; that nowhere in the charter is any mention made of operation of the road by the company, and that it was built solely for the purpose of connecting two railroads, the termini, location and character of the road to be determined by the R. F. & P. and the R. & P., and that these things indicate that the road was built with a view of leasing it to one or the other or both of these roads.

[11] If we give all the force which can fairly be given to the requirements of this section, if we concede (which of course we must) that the R. F. & P. and the R. & P. were vitally interested in securing the construction of a connection road; that they encouraged subscriptions to stock of the Connection Company; that they had the power to locate the termini of the new road and the character of the road and its location, still it is not at all essential or even important that the road should make a lease of its franchise and roadway to the connection companies in order for it to fulfil its purpose. If the making of a lease was essential or important, why did not the legislature expressly grant the power? It cannot be fairly said to be incidental to the objects for which the corporation was created, if some other means of accomplishing the objects which does not run counter to public policy. was as clearly implied. The authorities heretofore cited hold that when there is a doubt as to the grant of such power, it must be resolved in favor of the State. If this section of the charter stood alone, and if we did not have to resolve the doubt against the grant, the inference would be equally as strong that the company chartered to construct the road was authorized to operate it as that it was authorized to lease it.

[12] The contention of the Connection Company, therefore, that it was chartered for the purpose of making a railroad, and was given no express authority to operate it, and that therefore it was intended that it should lease it, falls—that is, it raises no presumption that the power to lease was intended to be granted, unless it clearly appears that the power to operate the road was withheld. In other words, in order for a presumption to arise in favor of the power to lease under this contention, it must clearly appear that the power to operate was withheld. This construction is not justified, as we have seen, from consideration of the first section of the charter alone. As between the inference, if we are left to inferences, that it was intended that the Connection Company should operate the road, and the inference that it had the power to lease its entire works and franchises, the inference would be in favor of the operation by the company, because operation of a railroad by a company authorized by charter to make it or build it, is one of the incidents or incidental powers of the authority to construct and would be presumed, while the power to lease, as appears from the authorities heretofore quoted, is not, and cannot be presumed from any of the ordinary grants of power.

[13] But the charter must be read as a whole, and when we read it as a whole, the inference is conclusive that the legislature intended the road should be operated by the company chartered to build it, or at least kept in its possession and under its control, except in case of sale as provided for in the charter. Thus, what becomes of the implication of power to lease from the express power to form a joint stock company for the purpose of *making* a railroad to connect two existing railroads, with no express power to operate it (clause

1), in the light of the power to charge a toll of not more than fifty cents for each passenger (clause 4) over the road, which the chartered company *alone* was permitted to collect? This latter provision clearly contemplates operation by the Connection Company, because in the event of a sale the purchasing company is expressly forbidden to charge toll under this toll franchise, and is limited to charge only such tolls as it is entitled to charge on other portions of *its* road. It can hardly be contended that, under a lease, the rights of the lessee would be greater, so far as charging tolls is concerned, than the rights of a purchaser. The same reasons, and the dictates of public policy, would apply as strongly in the one case as in the other. But, as we have seen, the right to collect high tolls, a right given exclusively to the Connection Company, necessarily means that operation by the Connection Company was intended.

[14] 2. The length of the road under the circumstances of this case does not raise a doubt as to the intention of the legislature that it should be operated independently. It is contended that a road of this length could not be successfully operated independently, but in the light of the fact that this road, because of its situation, would carry all through passengers and freight of both the R. F. & P. and the R. & P., its success, as a financial proposition, especially in view of the tremendous tolls it and it alone was permitted to charge, was assured. It did not have to build up a business. Its business was ready made.

3. We see no force in the contention that the first clause of the fifth section of the charter, confers, impliedly, authority upon the Connection Company to lease its road and franchise.

[15] By this clause it is declared that it shall be

lawful, by agreement between the company chartered by the act and the R. F. & P. and the R. & P., to transport passengers, goods, etc., over the connection road "upon such terms as may be agreed between them." This language certainly does not afford as strong an implication that the company should lease its road for this purpose as that it should retain possession and control of its road and make traffic agreements with the R. F. & P. and the R. & P. Indeed this clause confers the express authority to do this very thing, and it cannot properly be construed to confer a greater power than this, namely, to turn over its whole works and franchises to these two companies or either of them.

In *Thomas* v. *Railroad Co., supra* (101 U. S. 71, 25 L. Ed. 950), it was maintained that the power of a railroad company to make a lease may be implied from a provision authorizing it to make contracts for transporting "any kind of goods, produce, merchandise, freight or passengers." After quoting the provision, the court says: "This is no more than saying, 'you may do the business of carrying goods and passengers and may make contracts for doing that business. Such contracts you may make with any other corporation or with individuals.' No doubt a contract by which the goods received from railroad or other carrying companies should be carried over the road of this company, or by which goods or passengers from this road should be carried by other railroads, whether connecting immediately with them or not, are within this power, and are probably the main object of the clause. But it is impossible, under any sound rule of construction, to find in the language used a permission to sell, lease, or transfer to others the entire road and the rights and franchises of the corporation. To do so

is to deprive the company of the power of making these contracts which this clause confers and of performing the duties which it implies."

In *Pennsylvania R. Co.* v. *St. Louis, etc., R. R. Co.*, 118 U. S. 290, 312, 6 S. Ct. 1094, 1104, 30 L. Ed. 83, it was contended that the lease there involved, of property and franchises for ninety-nine years, was authorized by a statute which provided that "any railroad company * * * which may have constructed or commenced the construction of its road, so as to meet and connect with any other railroad, * * * shall have the power to make such contracts and agreements with any such road * * * for the transportation of freight and passengers, or for the use of its said road, as to the board of directors may seem proper." But the court said (at p. 312 [6 S. Ct. 1104] ): "We cannot see in this provision any authority to make contracts beyond those which relate to forwarding by one company the passengers and freight of another on terms to be agreed on, and possibly for the use of the road of one company in running the cars of the other over it to its destination without breaking bulk."

Indeed, it seems to us that the use of such expressions as "agreement to transport," "upon such terms," etc., rather excludes the idea of a lease, not only because this is the general rule (see *Thomas* v. *Railroad, supra*), but also, if for no other reason, because if the power to lease was intended to be implied from such language it was an exceedingly cumbersome way to express it, and it left the matter clouded in obscurity and doubt when it could have been made perfectly clear. How much easier it would have been, if the power to lease had been intended, to have said: "It shall be lawful for the company chartered by this act to lease its property and franchises to the R. F. & P. and the

R. & P., or either of them, upon such terms as may be agreed upon between them." This would have set at rest all doubt, and the fact that this was not done is most persuasive that the power to lease was withheld.

[16] As was said in *Central Transp. Co.* v. *Pullman's Car Co.*, 139 U. S., at p. 49, 11 S. Ct. 484 (35 L. Ed. 55), "the grant is supposed to be made at the solicitation of the grantee, and to be drawn up by him or by his agents, and therefore the words used are to be treated as those of the grantee; and this rule of construction is a wholesome safeguard of the interests of the public against any attempt of the grantee, by the insertion of ambiguous language, to take what could not be obtained in clear and express terms."

The appropriateness of these observations to the language used in the charter under review is obvious. *Charles River Bridge* v. *Warren Bridge*, 11 Pot. 420, 544-548, 9 L. Ed. 773; *Dubuque & Pacific Railroad* v. *Litchfield*, 23 How. 66, 88-89, 16 L. Ed. 500; *Slidell* v. *Grandjean*, 111 U. S. 412, 437-438, 4 S. Ct. 475, 28 L. Ed. 321.

Again, a lease of a railroad carries with it, as an incidental right, the right to transport passengers, freight, etc., over the leased road, without any agreement specifically to do this. In other words, upon the consummation of a lease of all the works and franchises, the lessees would succeed to the right of transporting passengers, merchandise, etc., over the road leased and of charging toll therefor, and yet we find the same section of the charter (section 5) after granting the R. F. & P. and the R. & P., or either of them, the ight to purchase in a certain way and within a cerain time, providing, that the companies or company making the purchase, "in the manner herein provided," "shall *succeed to* and *enjoy* the right of transporting

passengers, etc., * * * over the road so pur-
chased and of charging tolls therefor in the manner
and to the same extent as the said company or com-
panies so purchasing is, or are, entitled to charge
tolls on other portions of its or their railroads." In
the light of the latter provision of section 5, it is clear
that a lease was not contemplated by the first part
of the section, but that it was intended that the Con-
nection Company was to retain possession of the road
and the right to transport passengers, freight, etc.,
and to charge tolls, and that the R. F. & P. or the
R. & P. was to succeed to these rights *upon purchase*,
as provided for and not before.

We think, therefore, that the intent of the first para-
graph of clause 5 of the charter: "That it shall be
lawful, by agreement between the company chartered
by this act and the said R. F. & P. and the said R. &
P., or either of them, to transport passengers, etc.,
*. * * over the railroad connecting the termini, etc.
* * * upon such terms as may be agreed upon
between them," authorized traffic arrangements or
agreements, in which the Connection Company kept
physical possession and control over its road and
franchises, and not a lease by which it surrendered
possession and control to one or both of these roads.

[17] 4. It is said, however, that the power to sell
which may be said to be expressly granted by the
fifth clause of the charter because the right to purchase
is given the R. F. & P. and the R. & P., or either of
them, carries with it the lesser power to lease, impliedly.
Ordinarily this may be conceded to be true, but the
power to purchase and to sell, conferred upon the
parties here, is not unlimited. The right is expressly
given only for a period extending over ten years.
"And the R. F. & P. and the R. & P., or either of them,

shall have the *right* at any time, *not less than ten and not more than twenty years*, after the completion of the connecting railroad to purchase the said road * * * from the company chartered by this act."

We do not think the right to lease can properly be implied from this restricted right to purchase, and even if it could, the implied right to lease growing out of the *right* to *purchase* would be coextensive with the right to purchase. That is, it would begin when the right to purchase began, and end when it ended. It could hardly be said to exist before the right to purchase existed or to have continued after the right to purchase expired. The lease commenced upon the completion of the road in 1867. The right to purchase accrued in 1877 and expired in 1887. Does the right to purchase between 1877 and 1887 constitute the right to lease in 1866? We think not.

[18, 19] Nor is that all, the same clause which confers this limited power to sell (section 5) actually prohibited, at any time, the sale of an important part of the franchise conferred by the legislature upon the Connection Company. After conferring the right to purchase, as provided, it is declared, in effect, that the company purchasing shall succeed to the title, to the right to transport passengers, etc., just as the Connection Company enjoyed them, and to the right of charging tolls, *not* in the manner enjoyed by the Connection Company, but "in the same manner and to the same extent as the said company, or companies, so purchasing is, or are, entitled to charge tolls on other portions of its, or their, railroads."

Thus, it will be seen that the right to charge high tolls up to fifty cents a head for passengers and five cents per mile for each 100 pounds of merchandise, etc., which the Connection Company had the right

to charge, could not pass in case of a purchase with the title to the estate, and other franchises of the Connection Company, to the purchaser. Can it be said that this franchise as to tolls could legally be leased when it could not be purchased? It manifestly could not, and no construction of the parties can change the import of language which is plain and unambiguous. The toll franchise could neither be sold nor leased, and a lease attempting to transfer it is void. See *United States* v. *Union Pac. Ry.*, 160 U. S. at pp. 45-46, 16 S. Ct. 190, 40 L. Ed. 319.

We have dealt specifically with every section of the charter from which authority to lease the connection road could be implied and we have considered it as a whole, and our conclusion is that, so far as the charter indicates, construed in the light of the rules laid down by the courts, no such authority was granted by the legislature.

[20] But it is contended that the construction of the charter by the parties determines the construction to be given to it by what is known as the practical construction rule. This rule can have no application to a situation such as this record presents. If the State, by legislative act, had acquiesced in the construction placed upon the charter by the R. F. & P., the R. & P. and the Connection Company, the situation would have been different, but the State has never done so and it is not contended that it has. The charter is a grant from the State to the public service corporation, and no contract, not authorized by the charter, can ever become the means of construing the charter as giving authority for such contract, because the parties thereto lived up to its terms, for however long a time.

[21] "A contract of a corporation which is *ultra*

*vires* in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it." *Central Transp. Co.* v. *Pullman's Co., supra.*

[22] When the contract is once declared *ultra vires*, the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suit or action, nor does the doctrine of estoppel apply.

In *Thomas* v. *Railroad Co., supra* (101 U. S. at pp. 85-6 [25 L. Ed. 950] ), the court said: "It remains to consider the suggestion that the contract, having been executed, the doctrine of *ultra vires* is inapplicable to the case. * * * But what is sought in the case before us is the enforcement of the unexecuted part of this agreement. * * * Damages for a material part of the contract never performed; damages for the value of a contract which was void. It is not a case of a contract fully executed. The very nature of the suit is to recover damages for its nonperformance. As to this it is not an executed contract. * * * *.

"Having entered into the agreement, it was the duty of the company to rescind or abandon it at the earliest moment. * * Though they delayed its performance for several years, it was nevertheless a rightful act when it was done. Can this performance

of a legal duty, a duty both to stockholders of the company and to the public, give to plaintiffs a right of action? Can they found such a right on an agreement void for want of corporate authority and forbidden by the policy of the law? To hold that they can is, in our opinion, to hold that any act performed in executing a void contract makes all its parts valid, and that the more that is done under a contract forbidden by law, the stronger is the claim to its enforcement by the courts."

[23] An impressive argument was made, based upon the situation of the parties—that is, of the railroads—and the conditions existing at the time the charter was granted the Connection Company, and the view as evidenced by what they did and said, chiefly in their written communications, they took of the powers conferred by the charter. Looking at the case solely from this angle, there is something very persuasive about the fact that the R. F. & P. and the R. & P. were the prime movers in getting the connection road built; encouraging organization of the company, subscription to stock and the like; that it was built solely to connect these two roads; that its location, character of construction and termini were left to their determination, all of which impresses one with the feeling that the connection road really belonged to them, that it was their creature, and that the three roads could do practically as they pleased—sell, lease, or make traffic arrangements. In other words, that the public policy which was controlling ordinarily did not apply to this road, built under the cirumstances and conditions under which it was built. It may be that all the parties to the lease felt this way about it at the time the lease was made; but this position not only is not supported by, but is absolutely inconsistent

with, the provisions of the charter, and whatever may have been the thought of these people before, or their conduct after the granting of the charter, these threw no light on its interpretation, because the charter was applied for by a duly organized company, entirely independent in its organization of the existing railroads. It was granted in conformity to and in compliance with this application. No doubt the legislature would have granted the unrestricted power to lease or sell if the application had been made for such power. Under the rule of construction prevailing, the charter must be construed in favor of the State and against the corporation. Indeed, all doubts are to be resolved against the grant of a power not expressly given.

[24] We find an express power to sell, but this power was expressly restricted to a period beginning ten years after the completion of the connection road and ending twenty years after its completion. This is the only power of disposition hinted at in the whole charter. The expression of this lone power of disposition excludes any and all other powers of disposition. The cases so hold. All other expressions, claimed to give the implied power to lease, are far more capable of being interpreted to grant some other power than the power to lease, and a power not coming within the inhibition of public policy. So that, while the circumstances and conditions surrounding the parties at the time of the granting of the charter make one think that it would have been the natural thing to ask that the power to lease be granted, and cause one to wonder why it was not done, yet the omission from the charter of the express authority, and the absence of an expression which could fairly be interpreted as giving implied authority to lease, must outweigh any

impression we get from the situation of the parties and surrounding circumstances as to what *ought* to have been done. The legislature, at the instance of the parties, finally put their desires and intentions into a written memorial. Under the rules of construction, that memorial must speak for itself.

[25] We are not interpreting here a contract more or less ambiguous, if you please, between parties. If such were the case, the situation of the parties, the circumstances surrounding them and their subsequent conduct with reference to it would be exceedingly helpful in the interpretation, but these things afford little or no help in determining the powers conferred by the legislature in a charter upon a public service corporation.

The legislature was not a party to any of these things, and it granted a charter which, as the courts all hold, is the measure of the powers of the grantee.

In this connection, the language used by the court in the *Pullman's Car Co. Case, supra,* is most appropriate: " * * the grant is supposed to be made at the solicitation of the grantee, and to be drawn up by him or by his agents, and therefore the words used are to be treated as those of the grantee; and this rule of construction is a wholesome safeguard of the interests of the public against any attempt of the grantee, by the insertion of ambiguous language, to take what could not be obtained in clear and express terms."

Our conclusion, therefore, is that the lease, or contract, by which the property of the Connection Company and its franchises were turned over to the R. F. & P. was *ultra vires* and void, because there was no express or implied authority in the general law or in the charter to make the lease, because execution of the lease did not validate it and because it could not be ratified.

[26, 27] If the lease is void, it follows that the unexecuted part of the contract is unenforceable, so that even if the contract of lease was intended to be perpetual, after the expiration of twenty years from the completion of the connection road, without a purchase having been made, there can be no recovery because of the abandonment of the contract in May, 1919. Neither can there be a recovery for rent due under the *contract* as far as it was executed, for the reason that no action for damages can rightfully be founded on a void contract, and no void contract can become lawful or valid by being carried into execution. But the R. F. & P. having actually received the benefit of the use of the property of the Connection Company, right and justice demand that the latter should be permitted to recover upon a *quantum meruit* up to the time of the abandonment of the contract by the R. F. & P.

[28] Ordinarily, according to former rules of procedure in a case of this kind, the proper remedy would be for the aggrieved party, the Connection Company here, to disavow the contract and sue to recover as on a *quantum meruit*. Under the more liberal rules of pleading, especially in the case of action in assumpsit, to which this action by notice corresponds, where an action is founded upon a contract which is shown to be void, but where the contract has been executed and a defendant has enjoyed valuable rights thereunder, a recovery upon *quantum meruit* under the general issue should be permitted upon the original action without requiring the institution of entirely new proceedings, if the pleadings are sufficiently broad and the proof is sufficient. In the instant case, while the notice is founded upon the alleged contract of lease, the pleadings and evidence show everything that is necessary for a recovery upon a *quantum meruit*.

The right to recover upon a *quantum meruit* in such a case as this has been recognized by the courts. In *Central Transportation Co.* v. *Pullman's Car Co., supra,* the court said: "It was argued in behalf of the plaintiff that, even if the contract sued on was void, bebecause *ultra vires* and against public policy, yet that, having been fully performed on the part of the plaintiff, and the benefits of it received by the defendant, for the period covered by the declaration, the defendant was estopped to set up the invalidity of the contract as a defense to this action to recover the compensation agreed on for that period." And in answer to this contention it was said: "A contract made by a corporation, which is unlawful and void because beyond the scope of its corporate powers, does not, by being carried into execution, become lawful and valid, but the proper remedy of the party aggrieved is by disaffirming the contract and suing to recover, as on a *quantum meruit,* the value of what the defendant has actually received the benefit."

We consider the alleged contract or lease to have been executed up to May 6, 1919, because the record shows that the R. F. & P. either had custody and control of the Connection Company's road or received the equivalent of rent therefor from the United States government up to that date.

The whole railroad system of the R. F. & P., including the Connection Company's road, passed into the hands of the Federal government on December 31, 1917, and the connection road was abandoned by the Government on January 6, 1919, the R. F. & P. belt line tracks, then completed, being used by the government thereafter. For the entire R. F. & P. system, including the connection road, the annual income paid the R. F. & P. by the government under

contract amounted to $1,137,373.75. The contract between the Federal government and the R. F. & P. provided that the R. F. & P. pay the rents for all leased property. The government continued, after January 6, 1919, to pay the R. F. & P. the same compensation as it paid before abandonment, which was, in effect, at least, payment to the R. F. & P. for use of the connection road up to the time the R. F. & P. terminated the alleged lease.

[29] The amount of damages has been fairly fixed by the parties themselves in their attempted lease. It is only fair to assume that the connection road was worth to the R. F. & P. what the latter agreed to pay as rent.

[30] There was a plea of set-off filed by the R. F. & P., and rejected by the trial court. By the lease of August 1, 1866, the Connection Company leased its road and toll franchise, which authorized a toll charge of fifty cents per passenger, etc., carried over the leased road, and covenanted for quiet enjoyment of its term. By orders of the State Corporation Commission, the R. F. & P. was prohibited from charging over two cents a mile per passenger from October 1, 1907, to April 1, 1911, and from April 1, 1911, to December 31, 1917, not more than two and one-half cents a mile. Afterwards two and one-half cents per mile per passenger was kept in force during Federal control. If there was ever any cause of complaint on the part of the R. F. & P. on this account, it arose in 1907, and adjustment was made of the controversy by the parties at the time. Rent was paid under this adjustment without complaint for seventeen years. The amount of the set-off now asserted is $12,659.04. There are many reasons assigned in the brief of plaintiff why the set-off should not have been allowed,

among others a plea of the statute of limitations as to $8,797.89.

The plea of set-off was properly rejected by the trial court, treating the lease as legal. It came too late and after the parties had agreed to a new division of tolls as they existed after the order of the State Corporation Commission. Upon a *quantum meruit*, the claim of set-off should also be disallowed.

The effect of our conclusions, therefore, is, that the action of the trial court in finding for the plaintiff the sums as represented by items (1) and (2) of the account should be affirmed, but that so far as the 3rd item is concerned, for reasons heretofore stated, the finding should have been against this item.

We are of opinion, therefore, to reverse the judgment of the trial court as to the $284,000 item, and to affirm it as to the items of $134,793.54 and $36,645.01, with interest as heretofore set out on these items.

*Reversed in part; affirmed in part.*